# In the

# United States Court of Appeals

## For the Seventh Circuit

---

Nos. 02-1169 & 02-1179

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

BARBARA A. HARRIS,

*Defendant-Appellant.*

---

Appeals from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
Nos. 01 CR 22, 99 CR 49—**William C. Lee**, *Judge.*

---

ARGUED JANUARY 16, 2003—DECIDED APRIL 8, 2003

---

Before FLAUM, *Chief Judge,* and COFFEY and RIPPLE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Barbara A. Harris was indicted on one count of possession with intent to distribute crack cocaine, *see* 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and one count of being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1). After a jury convicted Ms. Harris on both counts, she was released for one day to place her affairs in order. She failed to surrender and later was arrested in California. Ms. Harris pleaded guilty to one count of failure to appear. *See* 18 U.S.C. § 3146(a). The court sentenced Ms. Harris to a term of 151 months' imprisonment, five years' supervised release and imposed a total of

$300 in special assessments. Judgment of conviction was entered on January 16, 2002, and Ms. Harris filed a notice of appeal the same day. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Barbara Harris owned a house at 1127 Michigan Avenue in Fort Wayne, Indiana, which became the subject of an investigation by the Allen County Police Department. On August 25, 1999, a search of Ms. Harris' trash uncovered a kilogram cocaine wrapper, a crack cocaine stirring stick and plastic sandwich bags. All of these items contained cocaine residue. The police also recovered a razor blade typically used for cutting crack cocaine. On August 27, 1999, officers obtained a warrant and executed it at 1:30 p.m. After knocking and receiving no response, they breached the doors of the well-secured house. Officer Dave Gladieux testified that, upon entrance, he observed Barbara Harris and her co-defendant Terrance Riley standing just inside the doorway to the master bedroom. Ms. Harris was clad only in panties; Riley was wearing only shorts and no shirt. Neither appeared to have been awakened recently. The officers cuffed each of them. In removing a blanket from the bed to cover Ms. Harris, Officer Gladieux observed $21,840 in United States currency on the bed. The officers found several small children upstairs.

Riley identified himself to the officers as Quatrell Ward; Ms. Harris corroborated that identification by nodding that he was Ward. However, Ms. Harris later admitted he

was Terrance Riley. With the aid of a dog trained to detect the presence of drugs, the officers searched the bedroom and discovered a Tupperware container of 87.70 grams of recently cooked crack cocaine under a box fan tilted down, presumably to cool the crack. The bowl was very warm to the touch. Detective Craig Wise testified that the crack had a street value of between $8,000 and $10,000, an amount consistent with distribution. Detectives also discovered a police scanner in the headboard of the bed and a loaded 9mm Ruger pistol on top of the headboard. In the kitchen, officers discovered a digital scale, a stirring stick with cocaine residue, plastic sandwich bags and a microwave capable of cooking crack cocaine. Moreover, there was a second loaded 9mm Ruger in a laundry room adjacent to the kitchen.

When questioned, Ms. Harris denied knowledge of any drugs or guns in the house. She stated that she had worked the night before, had come home, stayed up for a while and made food for her children. The Kendallville, Indiana, Nabisco plant's records show that she did work the 10 p.m. to 6 a.m. shift the night before. Ms. Harris told Detective Brian Gore that she was in the bedroom preparing to go to sleep, when Riley ran into the room and threw the money on the bed after emptying it from his pockets. The parties stipulated that Ms. Harris had a prior felony conviction and that the firearms were not manufactured in Indiana, so they must have "traveled across a state boundary line and thus affected interstate commerce." Tr. 9/21/00 at 151.

Terrance Riley testified on Ms. Harris' behalf. Riley had a five-year-old child by Ms. Harris. He testified that they had a rocky "off-and-on" relationship and that he had hidden from Ms. Harris the fact that he had been dealing cocaine and crack cocaine. He testified that she knew he

had served prison time for drug dealing. Riley testified that Ms. Harris did not handle the guns, use drugs or sell drugs. He also admitted that he had given Ms. Harris drug money, but that he had told her the money came from a job painting cars.

Riley explained that the drug paraphernalia found in the trash was his and that he had broken down a kilo of cocaine while Ms. Harris was at work. Riley also gave his explanation of what happened on the day of the arrest. He testified that, because his normal place for preparing drugs was unavailable on this day, he had brought the money, scale, materials and drugs into the house while Ms. Harris was sleeping. He had cooked a batch of crack and had placed it on the floor in the bedroom under a fan. Riley testified that he threw the gun and money into the bedroom when he heard the police knocking. He had awakened Ms. Harris to answer the door because there was an outstanding arrest warrant for him. Riley admitted that he originally had told the police that he had thrown the drugs into the bedroom and that they just happened to land under the fan.

## B.  District Court Proceedings

On September 22, 2000, a jury convicted Ms. Harris on both counts. The jury also found that the violation of 21 U.S.C. § 841(a)(1) involved more than 50 grams of crack cocaine. R.142. As noted previously, after the jury returned its verdicts, the district court released Ms. Harris for one day in order to permit her to place her affairs in order. She did not report at the appointed time and was later apprehended in California. Upon return to Indiana, she eventually pleaded guilty to a charge of failing to appear.

The district court accepted the recommendation of the pre-sentence report that the base offense level for the drug conviction was 32. *See* R.206 at 21. Two points were added for the specific offense characteristic of two firearms being seized during the search. *See id.* at 5. The court added two more points for obstruction of justice for Ms. Harris' failure to appear as ordered. *See id.* at 5, 9. Finally, the court subtracted four points based on her role as a minimal participant, yielding an offense level of 32. *See id.* at 12-14. The court reached a criminal history category of III, which yielded a range of 151-188 months, and the court imposed the minimum sentence. *See id.* at 21. In calculating the criminal history category, the court included three points based on prior convictions for criminal conversion (shoplifting). Ms. Harris argued that the prior offenses were to be excluded under U.S.S.G. § 4A1.2(c) because they were similar to passing an insufficient funds check, an excluded offense. The court rejected that argument. *See id.* at 20. The court grouped the failure to appear conviction with the drug and firearm conviction pursuant to § 3D1.2(c). *See* Tr. Sentencing Hr'g 1/16/02 at 15-16.

## II

## DISCUSSION

### A.

Ms. Harris first submits that the jury's verdict is against the manifest weight of the evidence. In evaluating this contention, we must determine whether, " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir. 1986) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in

original)). To secure a conviction for violating 21 U.S.C.
§ 841(a)(1), the Government must prove: 1) knowing or
intentional possession of the drug, 2) possession with intent
to distribute and 3) knowledge that the drug was a con-
trolled substance. *See United States v. Hunter,* 145 F.3d 946,
950 (7th Cir. 1998); *United States v. Covarrubias,* 65 F.3d 1362,
1369 (7th Cir. 1995).

Ms. Harris contends that Riley's drug manufacturing
occurred without her knowledge while she was asleep.
She bases her argument on four points of record evidence:
1) The first officer to enter the home saw Ms. Harris in the
doorway of the master bedroom in a state of undress, *see*
Tr. 9/21/00 at 25-26; 2) Another officer, upon entering the
bedroom with a sniffing dog, saw a fan tipped down to-
ward a dish on the floor, *see id.* at 47, 65; 3) Several children
were in the home at the time of the officers' entry, *see
id.* at 28, 39-40; and 4) An officer described the day as
"pretty hot," *id.* at 40. Ms. Harris argues that her state of
undress and the presence of children in the house substanti-
ate her testimony that she had been in the bedroom when
the police knocked and was unaware of what Riley was
doing with the drugs in another room. She would not
have been in other parts of the house in that state of un-
dress, she argues, when children were present in the
home. The testimony that the fan was tipped down to-
ward the cocaine corroborates, in her view, Riley's story
that the crack had been placed there before the police
arrived. The fact that it was a hot day provides an inno-
cent explanation why the fan was on.

The foregoing arguments are jury arguments. They ask
the trier of fact to ascribe a particular significance to the
adjudicative facts of record. They do not require that the
trier of fact accept such an explanation, and they certainly
do not establish that there is no evidence of record from

which a jury could determine beyond a reasonable doubt that Ms. Harris, by aiding and abetting the activities of Riley, knowingly possessed the cocaine with the intent to distribute it.

Possession of contraband may be actual or constructive. We agree with the Government that the evidence of record permitted the jury to conclude that Ms. Harris constructively possessed the drugs. Constructive possession exists when the evidence sufficiently demonstrates "ownership, dominion, or control." *United States v. Hernandez*, 13 F.3d 248, 252 (7th Cir. 1994). To prove constructive possession, the Government must show that the defendant had the ability to exercise control over the cocaine or the power to possess it. *See id.* The exercise of control need not be exclusive, but when it is not, there must be a nexus between the accused and the contraband. *See id.* Along with other circuits, we have held that a possessory interest over the location of the contraband can provide evidence of constructive possession. For instance, we have found that registration and control over a hotel room containing cocaine can be indicative of ability to control drugs present in the hotel room. *See United States v. Perlaza*, 818 F.2d 1354, 1360 (7th Cir. 1987). We also have addressed an analogous circumstance in the context of car ownership.[1] A number of

---

[1]  *See United States v. Covarrubias*, 65 F.3d 1362, 1369-70 (7th Cir. 1995). In *Covarrubias*, a married couple was convicted for possession of marijuana with intent to distribute. Mrs. Covarrubias argued that the drugs were her husband's and that she had no knowledge of drugs hidden in the car in which they were riding. *See id.* at 1369. The court found the evidence sufficient to establish her control over the drugs because "she owned the car, she was married to its driver, and she had ridden in the car for over twenty-four hours with only brief stops." *Id.* at 1370.

courts have found that a person may be deemed in constructive possession of items found on the premises of property that they own.[2]

In our view, the evidence of record in this case permitted the jury to conclude, beyond a reasonable doubt, that Ms. Harris knowingly possessed the drugs with the intent to distribute them. At the outset, the drugs were found in her home. The drugs and the tools necessary for dealing with them were found in various locations throughout the house. She could not have helped seeing the drugs and knowing what was transpiring. The evidence of drug preparation in the home was significant. The officers found $8,000 of freshly cooked crack cocaine cooling beside her bed, $20,000 of currency on the bed, a drug scale and stirring stick on the kitchen counter, a police scanner and loaded 9mm Ruger semiautomatic pistol on her headboard, and a second 9mm Ruger pistol hidden in the laundry room. *See id.* at 112-18, 151.

The jury also was entitled to consider evidence that the search of the trash from the house several days earlier had produced a wrapper from a kilo of cocaine, baggies and a stirring stick made from a coat hanger. *See id.* at 109-10,

---

[2] *See United States v. Edelin*, 996 F.2d 1238, 1241 (D.C. Cir. 1993) (finding that a "jury may infer 'that those who live in a house know what is going on inside,' [and thus] 'a person exercises constructive possession over items found in his home . . . even when that person shares the premises with others'" (citations omitted)); 1 Sarah N. Welling, et al., Federal Criminal Law and Related Actions § 9.5, at 273-74 (1998) (noting that the D.C., Second, Fourth, Fifth, Eighth and Eleventh Circuits all have held that ownership or exercise of dominion or control of a home containing drugs is evidence of constructive possession).

151. These items, all closely connected with a crack operation, certainly suggest strongly that the cocaine related activity observed by the officers upon their entrance into the home several days later was not a one-time event that had somehow escaped the attention of Ms. Harris.

The jury also was entitled to give some weight to the fact that Ms. Harris was in a long-term relationship with the principal dealer. We note, however, that it is not solely Ms. Harris' relationship with Riley that supports a conclusion of constructive possession. *See United States v. Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002) (noting that in "employing the constructive possession doctrine . . . courts must be mindful not to sweep within the doctrine's purview the innocent bystander who is merely present while others engage in illegal drug activity"); *United States v. DiNovo*, 523 F.2d 197, 201 (7th Cir. 1975) (noting that constructive possession could not be justified solely by the fact that the woman in that case lived in a trailer with her husband who dealt drugs and stored them there). There is far more evidence against Ms. Harris than the fact that she and Riley had a relationship and a child together. Ms. Harris owned the home alone. Moreover, the drugs were literally at her feet when the police broke into the house. In short, Ms. Harris' ownership of the home and the circumstances present upon the arrival of the officers are of sufficient probity to permit the jury to conclude that Ms. Harris was a willing accomplice to the activity of Riley.

Ms. Harris nevertheless contends that there "was no affirmative evidence that [she] knew or should have known that Riley had been manufacturing crack." Appellant's Br. at 20. Indeed, she suggests that the Government's evidence establishes that the drug manufacturing occurred without her knowledge while she was asleep. *See id.* at 21-22. As we have just noted, we cannot accept the view that

there was no affirmative evidence of her complicity. The jury was entitled to rely on circumstantial evidence and to draw reasonable conclusions from that evidence. The jury also was permitted to conclude that inconsistencies in her own testimony and that of Riley rendered suspect their version of the situation. For instance, when the officers questioned Ms. Harris at the scene as to what she was doing, she responded that she had just prepared a meal for her children and was getting ready to go to bed. *See* Tr. 9/21/00 at 71-72.[3] If Ms. Harris was awake and had been in the kitchen cooking, the jury was entitled to be more than a little skeptical of her assertion that she was unaware of Riley's cooking the cocaine. Similarly, the jury was permitted to assess her factually incorrect statements at the time of her arrest that she had known Riley for only a year, that Riley had removed the money from his boxer shorts and that his name was Quantrell Ward. *See id.* at 70-72, 76-77. Moreover, the jury was entitled to disbelieve Riley's testimony that his girlfriend and mother of his child was not involved in or aware of the drug manufacturing. *See United States v. Stott*, 245 F.3d 890, 898 (7th Cir. 2001) ("Questions of witness credibility are reserved for the jury, and its assessments will not be second guessed by an appellate panel." (internal quotation marks and citation omitted)).

There clearly was sufficient evidence to support the jury's verdict.

---

[3] Ms. Harris maintains that she told the officers that she had been asleep, not about to go to sleep. *See* Tr. Sentencing Hr'g 1/16/02 at 2. Nevertheless, the evidence at trial, which the jury could rely upon was the officer's statement that she indicated she was not yet asleep.

**B.**

Ms. Harris' second contention on appeal is that the district court committed plain error by not granting a mistrial. We usually review the denial of a motion for a mistrial for an abuse of discretion. *See United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002). However, although Ms. Harris objected to the evidence at trial and moved to strike it, she made no motion for a mistrial. Under these circumstances, the appropriate review is for plain error. *See United States v. Carraway*, 108 F.3d 745, 761 (7th Cir. 1997).

Ms. Harris objects to the following colloquy during redirect of Detective Wise:

Q. Now, you said you made the decision to arrest Miss Harris. Is that based on the physical evidence that was found in her home?

A. Yes.

Q. And anything else?

A. The history I had, the information I was receiving in the past that Barbara Harris was delivering cocaine for Terry Riley, due to the fact that he had warrants—

Mr. Hammond:  Objection, Your Honor, far beyond the scope of this case, and move to strike.

The Court:  Sustained. And I'll instruct the jury to disregard that testimony.

*See* Tr. 9/21/00 at 146.

Such testimony was improper and should not have been solicited from the witness. However, the court did sustain the objection and gave an appropriate limiting instruction. The court instructed the jury that "testimony and

exhibits that I struck from the record or that I told you to disregard are not evidence and must not be considered." Tr. 9/22/00 at 27. We presume that the jury will follow an instruction to disregard inadmissible evidence. *See United States v. Lomeli*, 76 F.3d 146, 149 (7th Cir. 1996) (holding that the jury is capable of sorting through evidence and of following court's instructions to disregard Government witness' statement that Defendant was "involved with the drug offense"); *Wilson v. Groaning*, 25 F.3d 581, 587 (7th Cir. 1994) (concluding that "highly inflammatory and totally irrelevant" testimony was adequately cured by court's prompt striking of testimony and later instructions to disregard). Consequently, we consider the district court's corrective action to have overcome the prejudicial effect of the witness' statement. It was not plain error for the court to fail to grant a mistrial sua sponte.[4]

## C.

Ms. Harris also submits that the district court should not have considered her shoplifting convictions in calculating her criminal history. In her view, these misdemeanor offenses are similar to the offense of issuing a check for which there are insufficient funds, an offense specifically excluded by the Guidelines. *See* U.S.S.G. § 4A1.2(c)(1).

---

[4] The experienced and very able trial judge gave no indication that this lapse was deliberate on the part of the prosecutor, the witness or both. We are certain that, had such a situation presented itself, the judge would have taken appropriate disciplinary action. The trial judge certainly was in a far better position than we are to assess such a situation, and we shall not second guess his handling of the matter solely on the basis of a cold record.

U.S.S.G. § 4A1.1 specifies the basic manner of calculating a defendant's criminal history. Subsection 4A1.1(c) provides that 1 point, up to a total of 4 points, be added for each prior sentence that included a punishment of less than sixty days' imprisonment. However, § 4A1.2 limits the applicability of § 4A1.1 through its definition of "prior sentence." Notably, subsection 4A1.2(c)(1) excludes certain enumerated prior offenses and "offenses similar to them, by whatever name they are known." Among the excluded offenses is "Insufficient funds check." However, Application Note 13 to § 4A1.2, further explains that "'Insufficient funds check,' as used in § 4A1.2(c)(1), does not include any conviction establishing that the defendant used a false name or non-existent account."

The district court, relying on the pre-sentence report, determined Ms. Harris' criminal history by counting seven previous convictions. Five of these were for the misdemeanor of criminal conversion; the other two were for the misdemeanor of Assisting a Criminal and the felony of Neglect of a Dependant. *See* pre-sentence report at 9-13. The Sentencing Table set out at U.S.S.G. § 5A indicates that 4 criminal history points place the defendant in category III. For a defendant like Ms. Harris with an offense level of 32, the resulting sentencing range is 151-188 months. Had all her shoplifting convictions been excluded, the two remaining convictions would have resulted in a criminal history category of II and a sentencing range of 135-168 months.

Ms. Harris contends that, in order to determine whether the shoplifting convictions ought to be counted, we ought to apply the five-point comparison set forth in *United States v. Booker*, 71 F.3d 685, 689 (7th Cir. 1995), and consider the similarities between shoplifting and Indiana's conversion and check deception statutes. *See* Ind. Code 35-

43-4-3 (conversion); Ind. Code 35-43-5-5 (check decep-tion). In *Booker*, we stated that, first of all, it was important to keep in mind that the purpose of the inquiry was to determine whether the defendant's prior offense was "categorically more serious" than the listed offense. *Booker*, 71 F.3d at 689 (quoting *United States v. Caputo*, 978 F.2d 972, 977 (7th Cir. 1992)). While noting that our circuit has not adopted a formal "test" for making this comparison, we acknowledged that the multifactored approach employed by several of our sister circuits was a "helpful device" in making the required comparison. Under that approach, the court compares: 1) punishments imposed, 2) perceived seriousness of the offense, 3) elements of the offense, 4) level of culpability and 5) indication of recurring criminal conduct. *See Booker*, 71 F.3d at 689. We also emphasized in *Booker* that, in the end, a common sense approach to this process of comparison ought to be of paramount concern. *Id.* Indeed, our subsequent cases consistently have repeated that theme. *See United States v. Boyd*, 146 F.3d 499, 501 (7th Cir. 1998); *United States v. Roy*, 126 F.3d 953, 954 (7th Cir. 1997) (conducting "common sense comparison"); *United States v. Binford*, 108 F.3d 723, 726 (7th Cir. 1997) (noting that *Booker* does not mandate a formal analysis of "similarity").

We agree with our colleague in the district court that, although both shoplifting and passing a bad check are essentially theft offenses, there is a substantial difference in the manner in which the crime is perpetrated. Like the district court, we find persuasive Judge Graber's dissent in *United States v. Lopez-Pastrana*, 244 F.3d 1025, 1031-37 (9th Cir. 2001) (Graber, J., dissenting). *See* R.206 at 20. In her dissent, Judge Graber maintained that one significant difference between passing insufficient funds checks and larceny is that only the latter requires the "trespassory taking of another." *Lopez-Pastrana*, 244 F.3d at 1035 (Graber,

J., dissenting). We also find persuasive Judge Graber's argument concerning the intent of the Sentencing Commission. She pointed out that "[p]etit larceny (or shoplifting, or petty theft) assuredly is one of the most common, and best known, of misdemeanors," yet it is not on the 4A1.2(c)(1) list. *Id.* at 1037 (Graber, J., dissenting). Judge Graber asked, "Is it really likely that the Commission intended to list petit larceny—perhaps the prototypical misdemeanor—but simply neglected to do so, or thought that it was *unnecessary* because petit larceny is so clearly 'similar to' insufficient funds check?" *Id.* (Graber, J., dissenting) (emphasis in original). As one member of this panel noted during oral argument, petit larceny is the "elephant in the room." There simply is no basis in logic or experience to assume that the Sentencing Commission meant to exempt it by implication.

We also point out that Application Note 13 of the Sentencing Guidelines § 4A1.2 explicitly limits the exclusion for bad checks to situations that involve an existing bank account with the defendant's real name on the check. The Commission therefore expressed a concern with the ease of locating the perpetrator. Shoplifting is difficult to detect; once the individual has left the store, apprehension becomes problematic. The Commission's concern with ease of detection certainly militates against an implication that shoplifting is exempt.

In taking this position, we join the majority of the circuits that have decided this issue. The judges of the Tenth and Eighth Circuits have held that convictions for petty theft or shoplifting are not similar to any offense listed in § 4A1.2(c)(1); only the panel majority in the Ninth Circuit has held to the contrary and, as we have noted previously, that opinion was met with a dissent that both the district court and this court find convincing. *Compare*

*United States v. Hooks*, 65 F.3d 850, 854-56 (10th Cir. 1995) (finding petty theft not similar to the listed exclusion "local ordinance provisions"); *United States v. Waller*, 218 F.3d 856, 857-58 (8th Cir. 2000) (finding petty theft is not on the exclusion list), *with Lopez-Pastrana*, 244 F.3d at 1027-31 (concluding shoplifting and insufficient funds check are similar).

The trial court's common sense approach to the Sentencing Commission's intent was correct; we agree that the shoplifting convictions were properly included in the calculation.

### D.

Finally, Ms. Harris contends that her conviction for possession of firearms by a convicted felon is invalid because the firearms did not affect interstate commerce. However, Ms. Harris has waived this issue. She did not raise the issue in the district court. Indeed, she stipulated at trial that the firearms had crossed state lines and that the movement affected interstate commerce. *See* Tr. 9/21/00 at 151-52. Now Ms. Harris argues that there was no waiver because the effect on interstate commerce is jurisdictional. However, we have held that the failure to prove facts establishing the interstate commerce element of a federal offense is not jurisdictional. *See United States v. Rogers*, 270 F.3d 1076, 1078 (7th Cir. 2001); *United States v. Martin*, 147 F.3d 529, 531-32 (7th Cir. 1998).

Even if we were to reach the merits, Ms. Harris' submission would fail. In *Scarborough v. United States*, 431 U.S. 563, 577 (1977), the Supreme Court concluded that, even if the interstate movement was not contemporaneous with the defendant's possession, proof that the firearm had, at some earlier point in time, moved across state lines would

suffice to show that the defendant possessed the gun in or affecting commerce. Ms. Harris nevertheless contends that *United States v. Lopez*, 514 U.S. 549 (1995), implicitly overturned *Scarborough*. We consistently have rejected that argument. *See United States v. Fleschli*, 305 F.3d 643, 652-53 (7th Cir. 2002); *United States v. Lemons*, 302 F.3d 769, 772-73 (7th Cir. 2002).

### Conclusion

The judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*