NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 18, 2007
Decided April 25, 2007

**Before**

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 06-3861

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. |
| *v.* | |
| JOSE OCHOA, *Defendant-Appellant*. | No. 05 CR 55 Larry J. McKinney, *Chief Judge*. |

**O R D E R**

Jose Ochoa was charged in 2005 with possessing with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1), conspiring to do the same, *id.* §§ 846, 841(a)(1), and possessing a firearm in relation to a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i). After presiding over a bench trial, the district court found him guilty on all counts. Mr. Ochoa filed a notice of appeal, but his appointed counsel cannot discern a nonfrivolous basis for appeal and moves to withdraw. *See Anders v. California*, 386 U.S. 738, 744-45 (1967). Mr. Ochoa challenges this conclusion in his response to counsel's submission. *See* Cir. R. 51(b). We confine our examination to those potential issues identified in counsel's facially adequate brief and Mr.

Ochoa's response. *See United States v. Tabb*, 125 F.3d 583, 584 (7th Cir. 1997) (per curiam).

Mr. Ochoa was arrested and charged on the drug and firearm offenses after the Indianapolis Police Department caught him trying to sell two pounds of methamphetamine to a cooperating witness in a controlled buy. After he signed a written waiver of his right to a jury trial, Mr. Ochoa filed a motion to suppress both the drugs and handgun seized during the operation, arguing, among other things, that his consent to the search that led to the discovery of the drugs and handgun was invalid because it was provided "without the benefit of an [English-speaking] translator." R.43 at 1. Because Mr. Ochoa filed the motion the day before trial, the district court stated that it would "consider whatever evidence and argument would be presented during the course of this trial" to resolve the motion. Trial Tr. 176, Feb. 9, 2006. That evidence, viewed in a light most favorable to the Government, established the following:

Police officers Brian Wildauer and Todd Wellmann began investigating Mr. Ochoa after Wesley Pankow, the cooperating witness, informed them that Mr. Ochoa was his methamphetamine supplier. Over a six-month period, Pankow stated, he visited Mr. Ochoa on several occasions at his home to purchase a total of 60 to 80 pounds of methamphetamine for approximately $14,000 a pound. Based on this information, Wildauer and Wellmann instructed Pankow to telephone Mr. Ochoa to set up another drug deal. While the officers recorded their conversations, Pankow told Mr. Ochoa that a friend of his wanted to purchase a large amount of methamphetamine on short notice. After a series of negotiations, Pankow eventually brokered a deal in which Mr. Ochoa would front him two pounds of methamphetamine. Mr. Ochoa said he would send Filberto Arreola--whom Pankow identified as Mr. Ochoa's drug courier--to deliver the drugs at a meeting place around the corner from Mr. Ochoa's home.

Shortly before the meeting was to occur, Officer Wildauer--who was conducting surveillance across the street from Mr. Ochoa's residence--observed Arreola leave Mr. Ochoa's house and proceed to the meeting place. Officer Wellmann donned the guise of Pankow's fictional drug-dealing friend and accompanied him to the meeting. Upon Arreola's arrival, Wellmann oversaw his arrest and the seizure of the two pounds of methamphetamine he was carrying. Once Arreola was arrested, police officers at the scene radioed Wildauer that Arreola and the drugs were in custody.

Upon hearing of Arreola's arrest, Officer Wildauer proceeded to Mr. Ochoa's home, knocked on the front door, and announced himself. After Mr. Ochoa answered the door and stepped onto the front porch, Wildauer patted him down "for officer safety." Trial Tr. 50, Feb. 9, 2006. During the pat-down, Wildauer felt in

Mr. Ochoa's front-right pocket a substance that he "knew immediately" was crystal methamphetamine, due to the substance's distinct shape and texture. *Id*. Wildauer then placed Mr. Ochoa under arrest and recovered two small bags of methamphetamine from his pocket.

Soon thereafter Officer Wellmann arrived at the residence and asked Mr. Ochoa if he spoke English and, if not, if he needed a translator. Mr. Ochoa responded that he did not need a translator and that he could write and speak English. Wellmann then informed Mr. Ochoa of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and Mr. Ochoa responded that he understood. Wellmann then asked Mr. Ochoa for permission to search his residence, and Mr. Ochoa responded that he could. Wellmann told Mr. Ochoa that "he should talk to a lawyer" and also advised that he could demand that the police get a search warrant before entering his house. Trial Tr. 152, Feb. 9, 2006. Mr. Ochoa responded that he did not need an attorney, and that it was unnecessary for the police to obtain a warrant. Wellmann then read aloud a consent form; Mr. Ochoa read along with him before saying "it was fine" and signing it. *Id*. at 154. At that point Mr. Ochoa did ask for a lawyer and refused to answer further questions regarding the investigation, but before Wellmann began his search of the residence, Mr. Ochoa volunteered that he should look first under the bed where he kept his gun. The officers recovered the loaded .357 revolver, and they discovered in the bedroom closet a duffel bag containing approximately $16,000.

After the Government rested its case, Mr. Ochoa presented no evidence and chose not to testify. The district court found Mr. Ochoa guilty on all counts. The court explicitly rejected Mr. Ochoa's contention that he could not understand English; it noted Mr. Ochoa had engaged in several recorded telephone conversations with Pankow in English. The court also stated that Pankow's testimony was especially credible because it was "consistent with the testimony of the police officers as to what happen[ed]." Trial Tr. 184, Feb. 9, 2006.

At sentencing the court determined that Mr. Ochoa was subject to a guidelines imprisonment range of 324 to 405 months, along with a mandatory consecutive term of 60 months because of his firearms conviction. *See* 18 U.S.C. § 924(c)(1)(A)(i). The court sentenced Mr. Ochoa at the bottom of the range, and added the 60-month term to impose a total sentence 384 months' imprisonment.

In her *Anders* submission counsel first examines whether Mr. Ochoa could challenge the seizure of the methamphetamine from his pocket and his subsequent arrest on the ground that Officer Wildauer's pat-down search was not supported by reasonable suspicion as required by *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). In reviewing the district court's denial of Mr. Ochoa's motion to suppress, we would review de novo all

questions of law, including the existence of both reasonable suspicion and probable cause. *See United States v. Johnson*, 383 F.3d 538, 542 (7th Cir. 2004).

We agree with counsel that it would be frivolous for Mr. Ochoa to challenge the pat-down search, but for reasons not addressed by counsel. In fact, it is irrelevant whether Officer Wildauer's search comported with *Terry* because a search that occurs immediately before a lawful arrest is deemed to be incident to that arrest so long as probable cause for the arrest arose independently of the items seized. *See Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980); *see also United States v. Jackson*, 377 F.3d 715, 717 (7th Cir. 2004). And that was the situation here. Wildauer had probable cause to arrest Mr. Ochoa for conspiring to sell Pankow methamphetamine based on (1) the detailed information that Pankow provided to the police regarding Mr. Ochoa, their previous drug deals and Mr. Ochoa's reputation as a drug dealer; (2) the recorded telephone calls between Pankow and Mr. Ochoa, in which they brokered the drug deal where Mr. Ochoa would send Arreola to deliver the drugs; (3) Wildauer's own observation that Arreola departed Mr. Ochoa's home immediately before he delivered the drugs to Pankow and Officer Wellmann; and (4) the seizure of two pounds of methamphetamine from Arreola--the exact amount that Mr. Ochoa agreed to front Pankow. *See United States v. Askew*, 403 F.3d 496, 507-08 (7th Cir. 2005). The drugs Wildauer recovered from Mr. Ochoa's pocket were not needed to arrest him for conspiring to sell methamphetamine. *See Rawlings*, 448 U.S. at 111; *Jackson*, 377 F.3d at 717; *see also United States v. Robinson*, 414 U.S. 218, 228 (1973).

Next, counsel examines whether Mr. Ochoa could challenge the search of his home on the basis that he did not freely consent to the search. As counsel explains, Mr. Ochoa "is not English-speaking, and a Spanish language interpreter was not provided to translate at the scene." *Anders* Br. 10. Therefore, counsel posits, Mr. Ochoa could not have known that he was consenting to a search of his home.

The Fourth Amendment's prohibition against warrantless searches of homes does not apply when law enforcement officials receive voluntary consent to search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006). Whether an individual's consent was voluntary is a fact-specific inquiry that we would examine for clear error, considering (1) the person's age, intelligence and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent. *See United States v. Santiago*, 428 F.3d 699, 704 (7th Cir. 2005).

In his Rule 51(b) response (which, we note, is entirely in English), Mr. Ochoa questions why counsel would even consider arguing on appeal that he needed a translator before signing the consent form. Mr. Ochoa insists that "it is settled in the record that [I] have an understanding of the English language." Appellant's Br. Resp. 3. The record confirms Mr. Ochoa's assertion. His conversations with Pankow and the two police officers were entirely in English; he informed Officer Wellmann (in English) that he did not require a translator and that he understood the *Miranda* warnings (which Wellmann read to him in English); he signed the consent form (which was printed in English) after having read it aloud with Wellmann; and he told Wellmann (in English) that the officer could find a handgun in his house. We therefore agree with Mr. Ochoa that there is ample evidence showing that he understood English when he consented to the search of his home. *See United States v. Navarro*, 90 F.3d 1245, 1257 (7th Cir. 1996); *United States v. Garcia*, 897 F.2d 1413, 1419 (7th Cir. 1990).

Nonetheless, Mr. Ochoa argues that his consent was involuntary because he gave it while under the "duress" of having been arrested. Appellant's Br. Resp. 4-5. But the fact that Mr. Ochoa was under arrest when he agreed to the search does not alone render his consent involuntary, *see United States v. Strache*, 202 F.3d 980, 986 (7th Cir. 2000); *United States v. Betts*, 16 F.3d 748, 753-54 (7th Cir. 1994), and Mr. Ochoa does not claim that he was subjected to threats, physical abuse, lengthy detention, or prolonged questioning, *see United States v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995). Indeed, the record shows that immediately upon his arrest Mr. Ochoa consented to the search, both verbally and by signing the consent form, and even though Officer Wellmann informed him that he had the right to require the police to obtain a search warrant. It therefore would be frivolous for Mr. Ochoa to argue that his consent was coerced. *See id.*

Counsel next examines whether Mr. Ochoa could challenge the sufficiency of the evidence supporting his convictions for possession with intent to distribute methamphetamine and conspiracy. Mr. Ochoa would face "a nearly insurmountable hurdle" if he were to challenge on appeal the sufficiency of the evidence underlying his convictions. *United States v. Jackson*, 177 F.3d 628, 630 (7th Cir. 1999). We would "overturn a verdict only when the record contains no evidence, regardless of how it is weighed," from which a finder of fact could conclude beyond a reasonable doubt that the defendant is guilty. *United States v. Gougis*, 432 F.3d 735, 744-45 (7th Cir. 2005) (internal quotations and citation omitted); *see also United States v. Hogan*, 89 F.3d 403, 404 (7th Cir. 1996).

To convict Mr. Ochoa of possessing methamphetamine with intent to distribute, the Government had to prove that he (1) knowingly (2) possessed methamphetamine (3) with the intent to distribute it. *See* 21 U.S.C. § 841(a)(1); *United States v. Starks*, 309 F.3d 1017, 1022 (7th Cir. 2002). The Government did

not need to show Mr. Ochoa actually possessed the methamphetamine; constructive possession suffices, which the Government could prove by showing that Mr. Ochoa had the authority to possess and determine the disposition of the drugs. *See United States v. Harris*, 325 F.3d 865, 869 (7th Cir. 2003). To prove that Mr. Ochoa took part in a conspiracy, the Government needed to prove the existence of an agreement between two or more people to possess with the intent to distribute methamphetamine, and that each defendant joined the agreement knowingly and intentionally. *See* 21 U.S.C. §§ 846, 841(a)(1); *United States v. Medina*, 430 F.3d 869, 881 (7th Cir. 2005). Factors that point to the existence of a drug conspiracy include transactions that involve large quantities of drugs, prolonged cooperation between parties, standardized dealings, and sales on credit. *See United States v. Eberhart*, 467 F.3d 659, 668-69 (7th Cir. 2006).

Any challenge to the sufficiency of the evidence underlying Mr. Ochoa's convictions would be frivolous because the evidence could have led a rational trier of fact to find that he possessed methamphetamine with the intent to distribute it, and that he entered into an agreement with Pankow and Arreola to sell the drug. At trial Pankow testified that over a six-month period he purchased an extremely large quantity of methamphetamine from Mr. Ochoa, which he sold out of his home. *See Harris*, 325 F.3d at 869-70 (holding that evidence supported conviction for possession with intent to distribute crack cocaine because, among other things, defendant owned the home in which crack was created). Pankow also related that Mr. Ochoa agreed to front him two pounds of methamphetamine, and that he would send Arreola--as he did in the past--to deliver the drugs; audio recordings of those conversations were played at trial as well. *See id.* Officer Wildauer stated that he observed Arreola leave Mr. Ochoa's house and proceed directly to the agreed-upon location for the drug deal, where, Officer Wellmann testified, he arrested Arreola and seized the two pounds of methamphetamine. *See United States v. Carrillo*, 435 F.3d 767, 775-76 (7th Cir. 2006) (holding that evidence supported conspiracy convictions where "[t]he majority of the evidence came from [a confidential informant]" and "included testimony from agents who had conducted surveillance on the defendants"). Finally, the search of Mr. Ochoa's house revealed $16,000 hidden in his closet--roughly the amount he charged per pound of methamphetamine. *See Gougis*, 432 F.3d at 745 (holding that evidence supported conviction for conspiracy to distribute cocaine where amount of money involved was "consistent with a drug transaction involving more than 500 grams of cocaine").

Next, counsel concludes in a brief footnote in her *Anders* submission that it would be frivolous for Mr. Ochoa to challenge the reasonableness of his 384-month prison sentence. Namely, counsel suggests that, because Mr. Ochoa failed to challenge the reasonableness of his sentence in the district court, a reasonableness challenge would be examined on appeal "under plain error review." *Anders* Br. 9

n.3.  Moreover, she continues, Mr. Ochoa could produce "no evidence to overcome the presumption of reasonableness here." *Id.*

Counsel is incorrect that Mr. Ochoa's reasonableness argument would be relegated to plain error review; "our decisions after [*United States v. Booker*, 543 U.S. 220 (2005)] . . . assume the absence of any need to object [in the trial court] to a sentence as unreasonable." *United States v. Castro-Juarez*, 425 F.3d 430, 433 (7th Cir. 2005); *see also United States v. Cunningham*, 429 F.3d 673, 679-80 (7th Cir. 2005) ("[A] lawyer in federal court is not required to except to rulings by the trial judge.").  But in any event, it would be frivolous for Mr. Ochoa to challenge the reasonableness of his sentence.  At sentencing, the district court determined that Mr. Ochoa's base offense level was 38 because he was responsible for more than 15 kilograms of methamphetamine, *see* U.S.S.G. § 2D1.1(c)(1), and added two levels for his managerial role in the drug conspiracy, *see id.* § 3B1.1(c).  This resulted in a total offense level of 40, which, when combined with Mr. Ochoa's Criminal History Category of II, yielded a guidelines imprisonment range of 324 to 405 months.  The court then heard from the Government and Mr. Ochoa's counsel, and after giving due consideration to their arguments regarding whether a sentence within the guidelines range was appropriate, *see Cunningham*, 429 F.3d at 678, applied the sentencing factors set forth in 18 U.S.C. § 3553(a).  Once the court examined the nature and circumstances of Mr. Ochoa's convictions, *see* 18 U.S.C. § 3553(a)(1), it concluded that a total sentence of 324 months on the drug counts was necessary to reflect the seriousness of his offenses, *see id.* § 3553(a)(2)(A), to serve as an adequate deterrent to both Mr. Ochoa and other methamphetamine dealers, *see id.* § 3553(a)(2)(B), and to protect the public from Mr. Ochoa, *see id.* § 3553(a)(2)(C).  Based on the district court's application of the § 3553(a) factors, we cannot say that Mr. Ochoa's guidelines sentence was unreasonable.  *See United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005).  And because *Booker* does not permit district courts to disregard mandatory minimum sentences, *see United States v. Miller*, 450 F.3d 270, 275 (7th Cir. 2006), it would be frivolous for Mr. Ochoa to argue that it was unreasonable for the court to impose the mandatory consecutive 60-month term.

Finally, Mr. Ochoa proposes to argue that the district court incorrectly accepted his jury waiver because "the waiver was filed without [his] expressed consent." (Appellant's Br. Resp. 6.)  But we presume that his written waiver was knowing and voluntary because it was accepted by both the Government and trial court pursuant to Fed. R. Crim. P. 23(a).  *See Sowell v. Bradshaw*, 372 F.3d 821, 832 (6th Cir. 2004); *cf. United States v. Wenger*, 58 F.3d 280, 282 (7th Cir. 1995) ("Most waivers are effective when set out in writing and signed.").  And Mr. Ochoa does not point to anything in the record that would suggest that he involuntarily waived his right to a jury trial.  *See Sowell*, 372 F.3d at 832 ("[T]he burden of demonstrating that a waiver of jury trial was not valid lies with the defendant who

waived it."). It thus would be frivolous for him to challenge the district court's acceptance of his waiver of his right to a jury trial.

Accordingly, we grant counsel's motion to withdraw and dismiss Mr. Ochoa's appeal.