In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 12-3738 & 12-3739

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SCOTT ADKINS,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
Nos. 2:09-CR-32-PPS & 2:10-CR-10-PPS — **Philip P. Simon**, *Chief Judge.*

ARGUED NOVEMBER 1, 2013 — DECIDED JANUARY 30, 2014

Before POSNER, FLAUM, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* This is a consolidated appeal of two separate, but related, cases against Scott Adkins. In one case, a jury convicted Adkins of attempting to possess heroin with intent to distribute, and of being a felon in possession of a firearm. In the other, Adkins pled guilty to receipt of child pornography. Adkins raises several arguments on appeal. He first attacks his convictions on the heroin and firearm charges, arguing that he is entitled to a new trial due to

alleged errors regarding evidentiary decisions, jury instructions, and improper statements by the government. We reject these arguments and affirm Adkins' heroin and firearms convictions. Adkins next argues that we should vacate his sentence on the heroin and firearm convictions because of multiple alleged sentencing errors. We reject these arguments and affirm his sentence as well. Finally, with respect to his child pornography sentence, Adkins contends that one special condition of his supervised release is unconstitutionally vague and overbroad, and that we may review this issue despite the appeal waiver in his guilty plea. We agree. We therefore vacate and remand on this ground alone.

## I. Background

In January 2009, Adkins was living with Nathaniel Jordan and Jordan's two daughters in Gary, Indiana. On January 27, United States customs agents at the UPS facility in Louisville, Kentucky, inspected and opened a package from Canada addressed to Jordan. The package allegedly contained clothing and two heavy stuffed snowmen. Inside the snowmen were pellets that field-tested for narcotics; the government says that the snowmen contained about 300 grams of heroin, a distribution quantity worth $30,000. Agents then sent the pellets for further testing, and put fake pellets in the snowmen as well as a transmitter that would signal if the snowman was ripped open. Agents re-wrapped the package, which was delivered to Jordan's house on January 29 by a customs agent disguised as a UPS driver.[1]

---

[1] A chemist later confirmed that the pellets contained heroin. The real heroin was destroyed before trial due to a mistaken destruction order.

Jordan signed for the package. One of Jordan's daughters testified that after the "UPS driver" left, Adkins went to Jordan's room, opened the package, said, "We've got some goodies," and took out a snowman. When the transmitter alerted, agents entered Jordan's home. Agents found an open snowman on the upper shelf of Jordan's bedroom closet, and another snowman on the dresser. In that room, agents also found plastic baggies and two digital scales, both of which are often used in the drug trade. One scale tested positive for heroin and cocaine, the other for heroin and procaine (which is sometimes mixed with narcotics). A search of Adkins' person and of Adkins' basement bedroom revealed no drugs or drug paraphernalia, but did reveal two handguns. In the living room, agents found three items that were admitted at trial: Adkins' passport; an itinerary for a bus trip from Gary to Toronto (via Detroit), for which Adkins was scheduled to depart on the morning of January 21, 2009; and a Western Union receipt from the afternoon of January 21, showing that a Samuel John had wired $75 to Adkins at the Detroit Greyhound bus station.

Agents then interviewed Adkins and Jordan.[2] According to the agents, Adkins admitted receiving and opening the package, said he was surprised that the package got through customs, and thought that it did "not feel like 300 grams." Adkins also allegedly told the agents that he had recently tried to go to Canada to receive heroin from a man named Sam but was denied entry, and that Sam then wired him money through Western Union so he could return by bus to

---

[2] Per department practice, these interviews were not recorded. The agents took interview notes but were later unable to locate them. The agents also prepared a report in the days following the interviews.

Gary. Adkins allegedly knew how the proceeds from the drugs would be split but did not admit that he would be receiving any of them.[3]

Adkins also allegedly said that the guns in his room belonged to an upstairs tenant. Adkins said that he had been repairing them. He knew the guns worked because he test-fired them in the backyard. The government did not test the guns for DNA or fingerprints.

While the agents were interviewing Adkins, he gave written consent for a search of his computers. The search revealed more than four hours of child pornography videos, including videos depicting sexual conduct with girls who appeared to be between five and seven years old.

In 2009, Adkins was indicted for his alleged drug and gun conduct. In 2010, a separate two-count indictment charged Adkins with receipt of child pornography, and possession of the same. After a jury trial on the heroin and gun conduct, Adkins was convicted of attempting to possess heroin with intent to distribute, and of being a felon in possession of a firearm. Following his conviction, Adkins pled guilty to receipt of child pornography and, in exchange, the government dismissed the possession charge. The district court sentenced Adkins to 210 months in prison for the child pornography conviction, plus a fifteen-year term of supervised release. Adkins also received ninety months' imprisonment for both the heroin and gun charges. Twelve of those months ran consecutively to his child pornography

---

[3] The agents' report of the interview said that Adkins admitted going to Canada to receive a "package," but the report did not mention heroin specifically.

sentence, so Adkins' total term of imprisonment is 222 months. The judge ordered four years of supervised release on the heroin charge and three years on the gun charge, both of which ran concurrently to the fifteen-year term of supervised release for the child pornography conviction.

## II. Discussion

### A. Evidentiary challenges

Adkins first challenges his heroin and firearms convictions on the ground that the district court should have excluded the evidence relating to his alleged trip to Canada to pick up heroin from "Sam" or "Sonny." This evidence consisted of Adkins' passport; an itinerary for a bus trip from Gary to Toronto (via Detroit), for which Adkins was scheduled to depart on the morning of January 21, 2009; and a Western Union receipt from the afternoon of January 21, showing that Samuel John had wired $75 to Adkins at the Detroit Greyhound bus station.

### i. Legal standards and proceedings below

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Taylor*, 604 F.3d 1011, 1014 (7th Cir. 2010). Adkins' challenges implicate two rules. First, Federal Rule of Evidence 404(b) prohibits evidence of a defendant's prior bad acts to show his propensity for bad behavior, but permits such evidence when offered to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Second, Rule 403 generally prohibits unduly prejudicial evidence.

Before trial, the government moved *in limine* for the admissibility of the trip-related evidence, and the district court agreed with the government. First, it found that the

evidence was not evidence of prior bad acts, but instead was direct evidence of the crime, because it tended to show Adkins' knowledge, preparation, and intent, "all of which are elements of the crime charged." The judge also found the trip-related evidence "to be extremely probative, and not unfairly prejudicial. So any [Rule] 403 balance in here, in my view, militates in favor of admitting the evidence." Second, and in the alternative, the district court found the trip evidence admissible under our test for Rule 404(b) evidence.

### ii. Analysis

In this case, the government needed to prove, among other things, that Adkins "attempted to knowingly or intentionally possess heroin" on or about January 29, 2009. Attempt requires the government to prove specific intent. *United States v. Coté*, 504 F.3d 682, 687 (7th Cir. 2007). Adkins contends that his alleged conduct a week earlier could not constitute evidence of his state of mind a week later when he received the snowmen; instead, he argues, the evidence of that trip was merely Rule 404(b) "bad acts" evidence. Adkins' argument is unpersuasive. The evidence of Adkins' trip to Canada—his passport, his bus ticket to Canada, his itinerary, and the Western Union receipt—served several legitimate purposes in the government's case. First, it tended to show Adkins' knowledge that the material he and Jordan received on January 29, 2009, was indeed heroin, because it was allegedly the same heroin he had tried to procure eight days earlier from the same supplier. Second, and for the same reasons, the evidence of Adkins' trip to Canada demonstrated his intent to procure heroin. Third, Adkins' failed trip to Canada explains why the heroin-filled package was shipped in a snowman—i.e., the failed trip provides a

motive for the package's shipment. Thus, the trip evidence is not evidence of a *prior* bad act, but of a determined individual to obtain this specific heroin from this supplier at this general time. Thus, Rule 404(b) does not apply here.

Adkins next argues that the district court's Rule 403 analysis was "perfunctory." It is true that the judge's reasoning could have been more extensive. In some cases, a "bare bones" recitation of Rule 403 has led to a reversal. *See, e.g.*, *United States v. Ciesiolka*, 614 F.3d 347, 357 (7th Cir. 2010). But in this case, the district court provided a sufficiently thorough analysis because it appears, in context, that the district court was relying upon the reasons articulated in its 404(b) analysis. In other words, the district court found the Canada-trip evidence more probative than prejudicial for the same reasons that it found the evidence to be direct evidence of criminality: the evidence went to Adkins' knowledge, preparation, and intent. Moreover, the trip-related evidence was prejudicial to Adkins only because it helped prove his alleged crime. *See United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) ("[A]ll probative evidence is prejudicial to the party against whom it is offered.").

Nonetheless, Adkins contends that the evidence was unfairly prejudicial because some jurors might have been unpersuaded that Adkins thought the snowmen contained heroin, but convicted him anyway for trying to travel to Canada a week earlier seeking the heroin. While this is theoretically possible, the much more likely inference is that the jurors convicted Adkins because he took the package, opened it, took out a snowman, said "We've got some goodies," ripped open a snowman, tried to hide it when agents arrived, and then told the agents afterward that he

was surprised that the package made it through customs and it "did not feel like 300 grams."

Adkins makes three final arguments about the Canada-trip evidence, all of which we reject. First, he contends that the district court erred by waiting until the end of trial to give a limiting instruction that the trip evidence should be considered only as to intent and knowledge. We have expressly rejected this argument before, and do so again. *See United States v. Akinrinade*, 61 F.3d 1279, 1284 (7th Cir. 1995). Second, Adkins argues that the district court erred by giving a generic limiting instruction about the trip-related evidence, rather than customizing that instruction to this case's facts. However, while we "encourage" district courts to give case-specific limiting instructions, we do not require them to do so. *United States v. Miller*, 673 F.3d 688, 702 n.1 (7th Cir. 2012). Third, Adkins contends that it was erroneous not to limit consideration of the Canada-trip evidence to the heroin charge. But there is no indication that this evidence affected the jury's consideration of the firearms charge. The only plausible inference is that the jury convicted Adkins of the firearms charge because two guns were found in his room and he admitted to test-firing them. We therefore reject all of Adkins' evidentiary arguments.

## B. Jury instructions

Adkins contends that the jury instructions constructively amended the indictment. Instruction No. 21 set forth the elements of attempted heroin possession, but did not contain a date on which the charged offense occurred. Instruction No. 28 said: "The Superseding Indictment charges that the offenses were committed 'on or about' January 29, 2009. The government must prove that the offenses happened

reasonably close to that date but is not required to prove that the alleged offenses happened on that exact date." Neither party objected to either instruction.

Jury instructions may not amend the indictment. *United States v. Trennell*, 290 F.3d 881, 888 (7th Cir. 2002). The Fifth Amendment requires that the allegations in the indictment and the proof at trial "match in order 'to insure that the defendant is not subject to a second prosecution, and to give the defendant reasonable notice so that he may prepare a defense.'" *Id*. (quoting *United States v. Folks*, 236 F.3d 384, 390 (7th Cir. 2001)). To prove that a constructive amendment has occurred, "the crime charged in the indictment must be materially different or substantially altered at trial, [so that] it is impossible to know whether the grand jury would have indicted for the crime actually proved." *Id.* (citation and internal quotation marks omitted). Because Adkins did not object below to the jury instructions, we review for plain error. *See United States. v. Olano*, 507 U.S. 725, 731 (1993).[4]

Adkins argues that Instruction No. 21 "permitted the jury to find—as the Government argued in its initial closing argument—that Mr. Adkins took his substantial step by leaving Indiana for Canada" eight days earlier. Adkins is referring to the fact that, during closing arguments, the prosecutor mentioned several acts when discussing the "substantial step" necessary to prove attempt: "Going to

---

[4] An error is plain if it was (1) clear at the time of the appeal and (2) affected the outcome in the district court. *See United States v. Wheeler*, 540 F.3d 683, 689 (7th Cir. 2008). If these criteria are satisfied, we must then "decide whether the error is so fundamental in nature that upholding [the decision below] results in an intolerable miscarriage of justice." *United States v. Kirklin*, 727 F.3d 711, 718 (7th Cir. 2013).

Canada. Receiving a package that's supposed to have $30,000 worth of heroin. Open[ing] the package. Cutting open the snowmen. Those are all substantial steps towards putting that heroin in your possession." Adkins contends that the instructions allowed the jury to convict him for his trip to Canada because "the jury could have found that prior trip 'reasonably close' to the date" in the indictment.

We reject Adkins' argument for several reasons. First, the indictment charged Adkins with committing both the heroin and firearms offenses "on or about January 29, 2009." The district court's instructions were therefore perfectly consistent with the indictment. Second, although the prosecutor should not have said that a trip to Canada eight days earlier sufficed as a substantial step, the government was otherwise clear that the primary focus of the case was January 29, 2009. That was the day on which the package arrived, Adkins eagerly opened it, and he allegedly made inculpating statements to federal agents. Third, there was ample permissible evidence that the jury could have relied upon in convicting him (e.g., Adkins received the package, opened it, took out a snowman, said "We've got some goodies," ripped open a snowman, and then tried to hide it when agents arrived). *See United States v. Natour*, 700 F.3d 962, 969 (7th Cir. 2012) ("[E]ven where we have found a constructive amendment, we have not reversed if … the defendant was unable to show that the outcome of his trial would have been different … .").

## C. **Striking inadmissible evidence instead of declaring a mistrial** *sua sponte*

Adkins next argues that the district court plainly erred when it struck inadmissible Rule 404(b) evidence rather than

declaring a mistrial *sua sponte*. Adkins is referring to the fact that, during the government's cross-examination of co-defendant Jordan, the prosecutor asked, "Well, you knew when you sent Adkins to Canada to go visit—Sonny—to go visit Sam—Sonny, that Sonny had previously given Adkins drugs to smuggle?" Adkins immediately objected. The district court sustained the objection, and instructed the jury: "Ladies and gentlemen, that last line of inquiry, I am striking from the record, the last question and answer, and I'm going to admonish you to disregard it." Additionally, the district judge later reiterated during jury instructions that the jury "must not" consider anything that the judge had stricken from the record.

It was improper for the government to try to solicit testimony from Jordan that Adkins had allegedly smuggled drugs for Sam in the past. This was beyond the scope of both the government's notice and the court's ruling on the motion *in limine*. It should not have occurred.

Adkins faces several hurdles, however. First, our review is again for plain error because Adkins did not object to the instruction or request a mistrial. Second, we have repeatedly emphasized that district courts are "in the best position to evaluate the effect that an error may have on the overall course of the proceedings, as well as whether a limiting instruction can cure any potential prejudice." *United States v. Curry*, 538 F.3d 718, 728 (7th Cir. 2008). As a result, district judges have "broad discretion in deciding to give a cautionary instruction rather than to declare a mistrial." *Id.* Third, we presume that jurors "follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be

expected to put it out of their minds." *Id.* (quoting *United States v. Danford,* 435 F.3d 682, 687 (7th Cir. 2006)).

Fourth, Adkins' argument does not persuade us because the improprieties in his trial are quite similar to those in *United States v. Harris*, 325 F.3d 865 (7th Cir. 2003), where we affirmed a conviction. In that case, the government charged both Barbara Harris and Terry Riley with, inter alia, possession of crack cocaine with intent to distribute. Harris's defense was that she did not know Riley had drugs in their shared residence. A police detective testified at trial that he arrested Harris based on the physical evidence in her home and the fact that he had received information "in the past that Barbara Harris was delivering cocaine for Terry Riley." *Id.* at 871. The district court struck the testimony and gave a limiting instruction; after her conviction, Harris argued on appeal that the district court should have ordered a mistrial *sua sponte*. *Id.* We affirmed, explaining that although the testimony was improper, the district judge's "corrective action … overc[a]me the prejudicial effect of the witness' statement." *Id.* In *Harris*, the potentially prejudicial statement was a witness's answer; in Adkins' case, the potentially prejudicial statement was a prosecutor's question. If anything, an answer seems more potentially prejudicial than a question. Given *Harris* and our general deference to district courts in taking curative actions, we reject the argument that the judge plainly erred in not ordering a mistrial *sua sponte*.

### D. Improper vouching during closing argument

During closing arguments, both defendants attacked the government's case, noting that the agents had lost their interview notes, that they chose not to record the defendants' statements even though recording equipment

was available, that the agents' report was not prepared immediately and was not verbatim, that the agents had inconsistencies in their testimony, that their report had factual mistakes, and that the heroin was accidentally destroyed before trial. In rebuttal, the government responded to these attacks. Specifically, the prosecutor said that it was agency practice not to record statements, that the agents took careful notes, and that they consulted those notes to write reports two days later. Then, the prosecutor said: "Ladies and gentlemen, you can—we can—the Government can state with confidence that the agents relied on their memory and those notes and gave you a complete record of those Defendants' statements and what they said." Adkins alleges that, with this last statement, the prosecutor improperly vouched for the agents' credibility.

Because Adkins did not object at trial, we review for plain error, so Adkins must demonstrate that the outcome of his trial would have differed but for these remarks. *United States v. Wolfe*, 701 F.3d 1206, 1211 (7th Cir. 2012). He faces an uphill battle, as "improper statements during closing argument rarely constitute reversible error." *Id.*

We engage in a two-part inquiry in reviewing a prosecutor's comments. First, we ask whether the challenged statement was improper. *Id.* There are two types of impermissible vouching: "a prosecutor may not express her personal belief in the truthfulness of a witness, and a prosecutor may not imply that facts not before the jury lend a witness credibility." *Id.* at 1212 (citation omitted). However, a prosecutor may comment on a witness's credibility so long as "the comment reflects reasonable inferences from the evidence adduced at trial rather than

personal opinion." *Id.* (citation omitted). For instance, we found it permissible for a prosecutor during closing to comment on a witness's veracity where the comment was "immediately preceded by the prosecutor's argument that corroborating evidence showed the witness to be truthful." *United States v. Johnson*, 437 F.3d 665, 673 (7th Cir. 2006) (citation omitted). Second, if the prosecutor's remark was improper, we consider whether that comment deprived the defendant of a fair trial. *Wolfe*, 701 F.3d at 1211. We look to five factors to make this determination: "(1) the nature and seriousness of the misconduct; (2) the extent to which the comments were invited by the defense; (3) the extent to which any prejudice was ameliorated by the court's instruction to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction." *Id.* (citation omitted).

With respect to the first step of the inquiry, the government contends that, in context, these remarks were tied to evidence and therefore permissible. We disagree. We are troubled by the statement, "the Government can state with confidence" that the agents provided a complete and accurate report. That statement is quite different from saying, as did the prosecutor in *Johnson*, that "all of *the evidence*" supports a witness's veracity. 437 F.3d at 673 (emphasis added). Rather than making reasonable inferences from the evidence, the prosecutor explicitly vouched for the accuracy of the agents' memories. Such a statement is impermissible. It expresses "personal belief in the truthfulness of a witness" and also might "imply that facts not before the jury lend a witness credibility." *Wolfe*, 701 F.3d at 1212. This statement is even more disconcerting here,

because the defense's major theme was that the government conducted a sloppy investigation.

We therefore proceed to the second step of the analysis, the five-factor test. One factor—the fourth—supports Adkins, because defense counsel had no opportunity to respond to the statement made in the rebuttal portion of closing arguments. However, other factors support the government: the remark was "a solitary statement," *United States v. Griffin*, 194 F.3d 808, 824 (7th Cir. 1999); the district judge instructed the jurors that closing arguments were not evidence; and finally, the weight of the evidence was clearly against Adkins, for the reasons discussed above. We are therefore satisfied that Adkins was not deprived of a fair trial, despite the prosecutor's improper vouching.

### E. Sentencing

Adkins argues that we should vacate his sentence and remand for resentencing (on the heroin/firearms conviction) because the district court erred in calculating the proper guidelines range. Addressing this contention requires summarizing, in some detail, what happened at sentencing.

#### i. The sentencing proceedings

The district court sentenced Adkins separately in these two cases, sentencing him first on the child pornography conviction. The presentence investigation report (PSR) recommended an offense level of 35, after a three-level reduction for Adkins' acceptance of responsibility. The PSR attributed four criminal history points to Adkins: three from his 1995 conviction for possession of a stolen vehicle and unlawful use of a weapon, and a fourth for his heroin/firearms conviction in the other case before us on

appeal. (Although Adkins had not yet been sentenced on those charges, the guidelines state that a defendant should receive one point for most offenses for which he has been convicted but not yet sentenced. *See* U.S.S.G. § 4A1.2(a)(4).) This fourth point bumped his criminal history category up from II to III, increasing his guidelines imprisonment range from 188–235 months to 210–262 months. The district court accepted these calculations, and sentenced Adkins to 210 months' imprisonment and fifteen years of supervised release.

After a recess, the district court sentenced Adkins on the heroin and firearms charges. The PSR recommended a base offense level of 26 for Adkins' alleged possession of about 299 grams of heroin. The PSR assigned Adkins four criminal history points, again yielding a criminal history category of III. The PSR also computed "an alternate guideline calculation" that it claimed would have applied if Adkins' two cases had been charged together. In this scenario, the PSR reported that Adkins would have faced a total offense level of 38, matching his initial total offense level on the child pornography guideline, effectively subsuming the heroin and firearms offenses. The PSR said that Adkins would have been entitled to a two-level acceptance of responsibility reduction under U.S.S.G. § 3E1.1(a). The PSR did not award a three-level reduction under U.S.S.G. § 3E1.1(b). These "alternative" calculations yielded a total offense level of 36 (one level higher than that used at Adkins' child pornography sentencing), but also a criminal history category of II (which was one notch lower than that actually used). That discrepancy did not matter, however, because a base offense level of 35 and criminal history category of III and a base offense level of 36 and criminal

history category of II result in the same advisory range: 210–262 months. *See* U.S.S.G. § 5A (Table).

The district court ultimately found that the advisory range for Adkins' heroin and firearms convictions was seventy-eight to ninety-seven months' imprisonment, and four to five years of supervised release. The parties then debated whether any portion of Adkins' term of imprisonment should run consecutively to his child pornography sentence. The government emphasized that Adkins had committed a serious drug offense that merited some extra punishment. The court said that this case presented a "complex situation" under the guidelines, stating that "the guidelines would suggest, had I sentenced these cases together, to essentially disregard the heroin case." (Because of the large differential between his offenses, the child pornography offense would have "swallowed up" the heroin and firearms offenses.)

The court decided that ninety months' imprisonment was appropriate, and chose, under U.S.S.G. § 5G1.3, to run twelve of those months consecutively to the child pornography prison term in light of the seriousness of the drug conviction and Adkins' lengthy criminal history.[5] The court also imposed four years of supervised release on the heroin charge, and three years on the firearms charge, both of which ran concurrently to the fifteen years of supervised release on the child pornography charge.

---

[5] Although these convictions did not count for purposes of calculating Adkins' guidelines range, Adkins also had pre-1995 convictions for unlawful use of a weapon, possession of a stolen vehicle, and retail theft, as well as a conviction in 2006 for importing cocaine in Great Britain.

The court filed a post-sentencing memorandum further explaining its reasoning. The memorandum included consideration of the "alternate" world that the PSR had considered, stating: "In determining whether to run the drug sentence consecutive, concurrent or partially concurrent to the child pornography sentence, it was important to know what Adkins' guidelines range would have been had he been sentenced in one proceeding on all the charges." The court adopted the PSR's calculations: in this alternate world, after a two-level reduction for accepting responsibility, Adkins would have had an offense level of 36 and a criminal history category of II, yielding the same guidelines range as in the child pornography sentencing (210–262 months).

### ii. Analysis

At sentencing, a district court must engage in a two-part analysis. First, it must determine the defendant's sentencing range under the guidelines. *United States v. Dale*, 498 F.3d 604, 611 (7th Cir. 2007). Second, it must "hear the arguments of the parties and conclude by making an individualized assessment of the appropriate sentence based on the § 3553(a) factors." *United States v. Boroczk*, 705 F.3d 616, 622 (7th Cir. 2013) (citation omitted). We review the district court's interpretation and application of the guidelines de novo, and its findings of fact for clear error. *United States v. Sutton*, 582 F.3d 781, 783–84 (7th Cir. 2009).

Adkins argues that the district court engaged in two guidelines calculations—the actual offenses, and the alternate-world hypothetical—but erred in its hypothetical calculation. Specifically, in conducting the hypothetical calculation, the district court awarded Adkins a two-point reduction for his acceptance of responsibility, but Adkins

argues that it should have awarded him the full three-point reduction. This would have produced a guidelines range of 188–235 months, instead of a range of 210–262 months. Because of this difference, Adkins argues, the error was not harmless and we should remand for resentencing. The government responds that there was an error in calculating the hypothetical guidelines range, but the error worked to Adkins' benefit, as he should not have received any reduction in the hypothetical calculation because he pleaded guilty to only one of the two charges.

The plain text of the guidelines cuts against Adkins' argument. It suggests that a third point reduction is only merited where, among other things, a plea "permitt[ed] the government to avoid preparing for trial." U.S.S.G. § 3E1.1(b). But if Adkins had been charged and sentenced together, and if he had pled guilty to only the child pornography charge, the government would still have needed to prepare for and conduct a trial on the heroin and firearms charges. The government would therefore have not avoided preparing for trial. Indeed, where a defendant is indicted on multiple counts but pleads guilty to only some of the charged conduct, our sister circuits have held that a defendant is not entitled to a three-point reduction. *See United States v. McDowell*, 888 F.2d 285, 292–93 (3d Cir. 1989); *United States v. Kleinebreil*, 966 F.2d 945, 952–54 (5th Cir. 1992); *United States v. Chambers*, 195 F.3d 274, 277–79 (6th Cir. 1999); *United States v. Ginn*, 87 F.3d 367, 370–71 (9th Cir. 1996); *United States v. Thomas*, 242 F.3d 1028, 1033–34 (11th Cir. 2001); *see also United States v. Kellum*, 372 F.3d 1141, 1145–46 (9th Cir. 2004) (noting that a different situation might arise in some cases where all conduct is *not* charged in the same indictment, and

affirming a two-level reduction).[6] Accordingly, we reject Adkins' argument that the district court erred in calculating the guidelines range.

### F. Lack of a jury finding on the quantity of heroin

The jury instructions and verdict forms did not ask the jury to make a drug quantity finding. This was error; as the government candidly acknowledged, "the drug quantity question should have been submitted to the jury." *Apprendi v. United States*, 530 U.S. 446 (2000), requires that the jury find any fact, other than a previous conviction, that increases a defendant's statutory maximum sentence, and this extends to mandatory minimum sentences. *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013). The question is whether, in this case, the failure to submit the drug quantity to the jury is reversible error.

The government contends that plain error review applies to this challenge, whereas Adkins argues for de novo review. Adkins alleges that the district court misapplied the guidelines because it sentenced him to a punishment that exceeded the crime the jury found he committed. During the proceedings below, the government specifically asked the court to include a drug quantity finding on the verdict form. Adkins' attorney did not object, but he responded that "it seems like it confuses the issues a little bit for the jury."

---

[6] Several of these cases go further and state that a defendant is not entitled to *any* reduction for acceptance of responsibility where he does not plead guilty to all conduct charged in the same indictment. *See, e.g., Chambers*, 195 F.3d at 278. However, we need not reach that issue on the facts of this case, where all conduct was *not* charged in the same indictment and the district court only considered that possibility in the midst of a hypothetical.

When the court raised the issue again after a recess, the government withdrew its request and Adkins did not object.

On these facts, plain error review—at most—applies. *See United States v. Kirklin*, 727 F.3d 711, 717 (7th Cir. 2013). Like the defendant in *Kirklin*, Adkins did not object at trial to the judge's finding a fact that increased the mandatory minimum. *See id.* Moreover, as in *Kirklin*, the Supreme Court handed down *Alleyne* after Adkins was sentenced but before we considered the appeal. And as in *Kirklin*, the government conceded error in this case. *See id.* at 718. We can also assume *arguendo*, like the court in *Kirklin*, that the error affected Adkins' substantial rights, leaving us the remaining discretionary inquiry: "whether the error seriously affected the 'fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 732). As in *Kirklin*, we conclude that the error did not have such an effect. *See Kirklin*, 727 F.3d at 719.

In Adkins' case, the major question was whether to convict, not the quantity of drugs. According to the agents, Adkins said he was surprised that the package got through customs, and thought it did "not feel like 300 grams." The snowmen were initially heavy because they contained pellets, which field-tested for narcotics and which a chemist later confirmed were heroin—299.7 grams, specifically. The heroin was accidentally destroyed before trial due to a mistaken destruction order, but there was extensive paperwork and chain of custody evidence, which consistently pointed to 299.7 grams of heroin. *See Knox v. United States*, 400 F.3d 519, 523 (7th Cir. 2005) (affirming, despite *Apprendi* error, due to "the strength of the evidence"). As the district court noted at sentencing, "to the

extent there was a quantity of drugs in that house, that …
quantity was in fact 299 net grams of heroin." Thus, a jury
that convicted Adkins of attempting to possess heroin with
intent to distribute convicted him of trying to obtain 299 or
so grams.[7] *See United States v. Nance*, 236 F.3d 820, 826 (7th
Cir. 2000) ("If this jury was going to convict [the defendant]
at all—which it plainly did—there is simply no way on this
record that it could have failed to find that he was
conspiring to distribute" a particular quantity of drugs).
Because we will not "find a miscarriage of justice on plain
error review" when we are "convinced that … a properly
instructed jury would have found the defendants guilty of
distributing the requisite threshold quantities of narcotics,"
we affirm Adkins' sentence. *Kirklin*, 727 F.3d at 718–19
(citation and internal quotation marks omitted).

### G.  Special Condition Five

Adkins pled guilty to receipt of child pornography in an
agreement that contained an appeal waiver: Adkins
"expressly waive[d]" the right to appeal his child
pornography conviction, sentence, or the restitution
imposed to "any Court on any ground," except a limited
exception for ineffective assistance of counsel. The district
court imposed several special conditions as part of Adkins'
fifteen-year term of supervised release, but Adkins now

---

[7] The crucial number in the statutory scheme is actually only 100 grams
of heroin—a number Adkins seems to have far surpassed. *See* 21 U.S.C.
§§ 841(b)(1)(B)–(C) (if the crime involves less than 100 grams, a
defendant will be imprisoned for 0–20 years, with supervised release
ranging from 3 years to life; for 100 grams or more, a defendant will be
imprisoned for 5–40 years, with supervised release ranging from 4 years
to life).

challenges only one—Special Condition Five. It states that Adkins "shall not view or listen to any pornography or sexually stimulating material or sexually oriented material or patronize locations where such material is available." Neither party objected to the condition at the time. Two issues are presented here. The first is whether the appeal waiver bars review in this court. If it does not, the second issue is whether this special condition is unconstitutionally vague and overbroad. For the following reasons, we hold that there is a vagueness exception to appellate waivers, and that this special condition is unconstitutionally vague and overbroad.

### i.  Appeal waiver

Adkins makes two arguments for why the appeal waiver does not bar our review. He first contends that this appeal falls outside the scope of his waiver. We disagree. He next argues that an appeal waiver does not preclude this court from reviewing a condition of supervised release to determine if it is unconstitutionally vague. We agree.

### 1.  Scope of waiver argument

Appeal waivers in plea agreements are typically enforceable. *United States v. Chapa*, 602 F.3d 865, 868 (7th Cir. 2010). However, for an appeal waiver to bar review, the issue appealed "must fall within its scope." *Id.* Contract principles generally apply to plea agreements. *Id.* Adkins' plea agreement states that he will not appeal his conviction, sentence, or restitution order to any court on any ground. He contends that the inclusion of "restitution" suggests that "sentence" refers only to the period of incarceration. (If "sentence" included "restitution," then the plea might

include superfluous terms—a result we disfavor. *See United States v. Rourke*, 74 F.3d 802, 807 (7th Cir. 1996)). Thus, he argues, the conditions of supervised release are not part of his "sentence" as that term is used in his plea agreement. *Cf. id.* at 806 (significant ambiguities in a plea agreement should be construed in favor of the defendant). However, Adkins' argument conflicts with our precedent, which suggests that terms of supervised release *are* part of the sentence. *See United States v. Sines*, 303 F.3d 793, 798–99 (7th Cir. 2002) (holding that the defendant "waived the right to appeal his sentence, *including the terms and conditions of his supervised release*," when he agreed to a plea agreement that said he "expressly waives his right to appeal the conviction and sentence imposed on any ground." (emphasis added)); *see also id.* at 799 n.3 ("[W]e find that Mr. Sines waived his right to appeal the terms of his supervised release when he signed the plea agreement.").

## 2. Due process argument

Adkins next argues that, notwithstanding the appeal waiver, we can decide whether Special Condition Five is unconstitutional because a waiver cannot preclude review of an obvious due process violation on account of vagueness.

Our cases establish that there are at least some due process exceptions to a waiver of appellate review. *See United States v. Bownes*, 405 F.3d 634, 637 (7th Cir. 2005) (noting that there are "limitations on waiver of the right of appeal in a criminal case that are imposed by judicial interpretations of the due process clause") (citing, inter alia, *United States v. Schilling*, 142 F.3d 388, 394–95 (7th Cir. 1998)). Although we construe "plea agreements as contracts," we regard plea agreements as "unique contracts 'in which

special due process concerns for fairness and the adequacy of procedural safeguards obtain.'" *Carnine v. United States,* 974 F.2d 924, 928 (7th Cir. 1992) (quoting *United States v. Ataya,* 864 F.2d 1324, 1329 (7th Cir. 1988)). Thus, an appeal waiver will not prevent a defendant from challenging (1) a sentence based on "constitutionally impermissible criteria, such as race"; (2) a sentence that exceeds the statutory maximum for the defendant's particular crime; (3) deprivation of "some minimum of civilized procedure" (such as if the parties stipulated to trial by twelve orangutans); and (4) ineffective assistance of counsel in negotiating the plea agreement. *Bownes,* 405 F.3d at 637 (citations omitted).

There are multiple rationales for these exceptions, such as fundamental fairness to the particular defendant and the fundamental legitimacy of the judicial process generally. These rationales apply to obviously vague special conditions as well. If the defendant cannot reasonably know what he is and is not allowed to do, he should be able to obtain judicial review. He is entitled to special conditions that generally apprise him of what conduct is lawful and what could land him back in prison for violating his supervised release conditions. *See Grayned v. City of Rockford,* 408 U.S. 104, 108–09 (1972) ("[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."). Nor can we accept the government's invitation to address this problem after Adkins has served his sentence, for that risks sanctioning an unconstitutional special condition that should not be used in the meantime in other cases.

We pause to emphasize the narrowness of our holding. It remains the case that plea agreements are typically enforceable and that contractual principles generally apply. Nor is there a "general 'constitutional-argument exception' to waivers in plea agreements." *See United States v. Behrman*, 235 F.3d 1049, 1051 (7th Cir. 2000). Thus, it remains generally unproblematic to knowingly waive a constitutional right or to lose a constitutional right (in a clearly demarcated way and in accord with 18 U.S.C. § 3583(d)) via special conditions of supervised release.

The crucial distinction in this case, as we explain below, is that no reasonable person could know what conduct is or is not proscribed by Special Condition Five. This lack of notice is troubling in part because of the inefficiency it causes, as a defendant must avoid a wide range of conduct, some permissible and some not. *See* Laura A. Napoli, *Demystifying "Pornography": Tailoring Special Release Conditions Concerning Pornography and Sexually Oriented Expression*, 11 U.N.H. L. Rev. 69, 74 (2013). The possibility for inconsistent enforcement also concerns us, as different minds may interpret the same broad phrases differently. *Cf. Hill v. Colorado*, 530 U.S. 703, 732 (2000). In sum, we hold that despite a waiver of appellate review, the Due Process Clause permits review when a special condition is so vague that no reasonable person could know what conduct is permitted and what is prohibited.

### ii. Special Condition Five is unconstitutional

The parties agree that plain error review applies. District courts have "wide discretion" in determining conditions of supervised release. *Sines*, 303 F.3d at 800. That discretion has

limits, however. "A condition of supervised release is unconstitutionally vague if it would not afford a person of reasonable intelligence with sufficient notice as to the conduct prohibited." *United States v. Schave*, 186 F.3d 839, 843 (7th Cir. 1999); *see also United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002) ("A probationer, however, has a separate due process right to conditions of supervised release that are sufficiently clear to inform him of what conduct will result in his being returned to prison."); *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972). Moreover, unlike obscenity and child pornography, pornographic materials enjoy First Amendment protection, which means that we must be sensitive to the possible overbreadth of the condition as well. *See United States v. Williams*, 553 U.S. 285, 288 (2008); *United States v. Loy*, 237 F.3d 251, 259 n.2 (3d Cir. 2001) ("When a statute is vague and arguably involves protected conduct, vagueness analysis will necessarily intertwine with overbreadth analysis." (citing *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.6 (1982))); *see also* 18 U.S.C. § 3583 (noting that conditions of supervised release must, inter alia, be "reasonably related" to the § 3553(a) sentencing factors and must "involve[] no greater deprivation of liberty than is reasonably necessary").

Special Condition Five states: "The defendant shall not view or listen to any pornography or sexually stimulating material or sexually oriented material or patronize locations where such material is available." Read literally, this provision might preclude Adkins from using a computer or entering a library—irrespective of what he views in either place—because both are "locations" where "sexually stimulating material … is available." Indeed, he might not be able to ride the bus, enter a grocery store, watch television,

open a magazine or newspaper, read a classic like *Romeo and Juliet*, or even go out in public (given the ubiquity of advertisements that use potentially sexually oriented or sexually stimulating images to pique consumer interest). More practically, how can we tell which images or voices are sexually stimulating for Adkins? *Cf. United States v. Smith*, 972 F.2d 960, 962 (8th Cir. 1992) (striking down a supervised release condition and criticizing it as "unworkable" in practice). It is hard to see how the potential breadth of Special Condition Five would satisfy the narrow tailoring requirement of 18 U.S.C. § 3583(d).

Last year, in *United States v. Goodwin*, 717 F.3d 511 (7th Cir. 2013), we struck down a condition of supervised release that said: "You shall neither possess nor have under your control any material, legal or illegal, that contains nudity or that depicts or alludes to sexual activity or depicts sexually arousing material." We explained, in part:

> The inclusion of material that "alludes to" sexual activity within Condition 6's purview is particularly problematic. This dictate goes beyond a ban on the possession of pornography. If read literally, the inclusion of this term could block Goodwin from possessing much of the Western literary canon—or arguably even from possessing a slip copy of this opinion. Such a deprivation of liberty certainly would be greater than is reasonably necessary to achieve the goals of supervised release.

*Id.* at 524–25 (citing *United States v. Monteiro*, 270 F.3d 465, 473 (7th Cir. 2001) (vacating a "vague and overbroad"

special condition to enable the district court "to craft more precisely" the condition)). The terms of the Special Condition in this case are not identical to those in *Goodwin*, but if anything, the terms before us may be more all-encompassing because they prohibit viewing or listening to sexually stimulating material, not merely "possess[ing]" it, as in *Goodwin*. *Goodwin* found that the Special Condition in that case could not survive irrespective of whether plain-error review or abuse-of-discretion review applied, and compels the same result here.

Our conclusion is generally consistent with our sister circuits' approaches to this challenging area. *See, e.g.*, *United States v. Antelope*, 395 F.3d 1128, 1141–42 (9th Cir. 2005) (striking down as unconstitutionally vague a supervised release condition banning the possession of "any pornographic, sexually oriented or sexually stimulating materials"); *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002) (striking down as unconstitutionally vague a supervised release condition banning the possession of "any pornography," including legal adult pornography, because "a probationer cannot reasonably understand what is encompassed by a blanket prohibition on 'pornography'"); *United States v. Loy*, 237 F.3d 251, 265 (3d Cir. 2001) (striking down as unconstitutionally vague a supervised release condition banning the possession of "all forms of pornography, including legal adult pornography"); *Farrell v. Burke*, 449 F.3d 470, 486 (2d Cir. 2006) (noting that the Second Circuit has "strongly suggest[ed] that the term 'pornography' is inherently vague for defendants whose statute of conviction does not define it." (citing *United States v. Simmons*, 343 F.3d 72 (2d Cir. 2003)); *United States v. Cabot*, 325 F.3d 384 (2d Cir. 2003)); *see also United States v. Perazza-*

*Mercado*, 553 F.3d 65, 74–76 (1st Cir. 2009) (vacating a condition of supervised release that banned the "possession of any kind of pornographic material" because the district court did not provide an explanation for this condition, and "no evidence in the record … justifies the ban"); *cf. United States v. Armel*, 585 F.3d 182, 185–87 (4th Cir. 2009) (holding that sentencing court abused its discretion by imposing an unexplained three-year prohibition on adult "pornography" where defendant had been convicted of threatening federal officials). *But see United States v. Boston*, 494 F.3d 660, 667–68 (8th Cir. 2007) (upholding the breadth of the supervised release condition in part because the defendant was found guilty of producing child pornography); *United States v. Phipps*, 319 F.3d 177, 192–93 (5th Cir. 2003) (acknowledging that the ban on "sexually oriented or sexually stimulating materials" is "somewhat vague," but narrowing it so that it does not reach magazines and so that "the prohibition on patronizing sexually oriented establishments refers … to places such as strip clubs and adult theaters or bookstores").

The government argues that instead of vacating and remanding, we could avoid the condition's constitutional difficulties through a "commonsense" limiting construction. Some of our sister circuits have taken this approach in certain cases. For instance, when a supervised release condition prevents a supervisee from patronizing locations that offer sexually explicit materials, some courts have held that supervisees may go to libraries and grocery stores but not strip clubs and adult bookstores. *See, e.g.*, *United States v. Ellis*, 720 F.3d 220, 226–27 (5th Cir. 2013); *United States v. Accardi*, 669 F.3d 340, 346–47 (D.C. Cir. 2012). In some cases, a limiting construction is the appropriate course. For example, in *Schave*, we found that constitutional difficulties

could be "easily avoided through an appropriate limiting instruction." 186 F.3d at 843. In that case, the defendant was a member of a white supremacist organization and sold explosives (to an undercover agent) that were meant to be used in violent acts that furthered the group's aims. *Id.* at 840. A condition of supervised release provided that Schave "shall not associate, either directly or indirectly, with any member or organization which espouses violence or the supremacy of the white race." *Id.* at 843. We were troubled by the absence of a scienter requirement, but found that "[w]ithout much difficulty," we could construe the provision to "reach only those activities which would reasonably relate to the danger of [the defendant's] reassociating with white supremacist groups … which pursue their aims through violent means." *Id.* at 843, 844.

However, this is not a case where we can tweak the relevant condition "easily." *Id.* at 843. In order to render this special condition constitutional, we would need to define multiple key terms or provide multiple limiting constructions. In other cases where we found the special condition vague or much broader than necessary, we have vacated and remanded. *See, e.g., Goodwin*, 717 F.3d at 524–25; *Monteiro*, 270 F.3d at 473. And because the district court will retain jurisdiction over this case for many years, including the power to amend the conditions of supervised release at any time, *see* 18 U.S.C. § 3583(e)(2), it is in a superior position to write a new condition, if it so chooses.

We recognize the difficulty of drafting special conditions in this context. We therefore emphasize that various options remain open, including (1) defining the crucial terms in the existing special condition in a way that (a) provides clear

notice to Adkins (preferably through objective rather than subjective terms), (b) includes a mens rea requirement (such as *intentional* conduct), and/or (c) is not broader than reasonably necessary to achieve the goals of 18 U.S.C. § 3553(a)(2)(b), (a)(2)(C), and (a)(2)(D), *see* § 3583(d); and (2) narrowing the scope of proscribed conduct, such as by (a) focusing on child pornography, which federal statutes objectively define, *see, e.g.*, 18 U.S.C. § 2256(8), and/or (b) focusing on particular establishments such as strip clubs, adult bookstores, and adult theaters.

In sum, given the importance of notice and reasonably narrow tailoring, *see* 18 U.S.C. § 3583(d)—which our precedent, *Goodwin*, reinforces—we vacate Special Condition Five and remand to the district court.

### III. Conclusion

We AFFIRM Adkins' heroin and firearms convictions and sentences. We VACATE Special Condition Five of Adkins' child pornography sentence and REMAND so that the district court may revisit the condition in light of this opinion.