In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1990

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

XIANBING GAN,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cr-00781-1 — **Thomas M. Durkin**, *Judge*.

ARGUED SEPTEMBER 7, 2022 — DECIDED NOVEMBER 23, 2022

Before SYKES, *Chief Judge*, and HAMILTON and BRENNAN, *Circuit Judges*.

HAMILTON, *Circuit Judge*. A jury convicted defendant-appellant Xianbing Gan on three counts of money laundering and one count of operating an unlicensed money transmitting business, but acquitted him on one count of participating in a money laundering conspiracy. He was sentenced to 168 months in prison. Gan raises four issues on appeal: whether a law enforcement expert improperly provided testimony

interpreting communications the jury could have understood itself; whether a jury instruction misstated the mens rea required for the money-laundering convictions; whether the prosecutor made improper remarks during closing; and whether the district court erred by considering the acquitted conspiracy conduct at sentencing.

We affirm Gan's convictions and sentence. There was no plain error in the challenged expert testimony. Gan waived his jury instruction challenge. The prosecution's closing remarks were not improper. And finally, binding Supreme Court precedent allows consideration of acquitted conduct at sentencing when, as in this case, the judge finds the conduct proved by a preponderance of the evidence. In Part I, we provide factual and procedural background relevant to Gan's challenges. In Parts II through V, we consider each of Gan's four challenges.

I.  *Factual and Procedural Background*

Gan lived in Mexico and worked with business associates in the United States to launder money for drug trafficking organizations. One of Gan's couriers began cooperating with the government and participated undercover in three cash pickups coordinated by Gan. Recordings from those undercover operations and testimony from the courier were central to the government's case for the counts on which Gan was convicted.

A.  *The Money Laundering Method*

It is helpful to understand the money laundering method used by Gan. His challenges include claims that expert testimony undermined his defense of entrapment and that the jury could have believed he acted "knowingly" but not

"willfully." Yet his use of complex concealment procedures during the recorded transactions tends to show that Gan was not a novice in this scheme.

Gan and his associates used so-called "mirror transactions" to launder money across international borders for drug trafficking organizations. In a mirror transaction, a drug trafficking organization delivers cash to a courier for a money laundering organization. That courier in turn gives the money to a business in need of cash. That business then transfers an equivalent amount of another currency to a foreign bank account belonging to a member of the money laundering organization. The account owner then withdraws the money in cash and hands it back over to the drug trafficking organization. No paper trail connects the final cash in the hands of the drug trafficking organization with the cash it originally obtained in exchange for drugs.

In early 2016, Gan recruited Seok Pheng Lim to work as a courier. She was told to expect to conduct one to two transactions per week, each ranging from $100,000 to $1 million. Lim would receive United States currency from a drug trafficking organization and give that cash to an American business that would deposit an equivalent amount of Chinese renminbi into a Chinese bank account. The money laundering organization would withdraw the renminbi as "clean" United States or Mexican currency to give back to the drug trafficking organization.

Each cash hand-off involved a series of communications designed to maintain anonymity and security. For each transaction, Lim bought a "burner" phone and made up a false name that she communicated to Gan. Gan would give his contact at the drug trafficking organization that code name and

the number of Lim's burner phone. When Lim's phone rang and the voice on the other end uttered the code, she would arrange a meeting time and place. The day of the hand-off, Lim would send Gan the serial number of a one-dollar bill in her possession. Gan would pass that number to the drug trafficking organization. When Lim and the drug trafficking courier met, Lim would show the bill to verify that she was the correct courier to receive the cash. Lim would exchange that dollar bill for the large sum of cash, with the dollar bill acting as proof that the hand-off occurred.

The money laundering business in which Gan, Lim, and others were involved had multiple contacts with law enforcement prior to the transactions at issue. In early 2017, authorities seized over $1 million from transactions involving this money laundering organization. In May 2018, authorities approached Lim and she began cooperating. Acting undercover, she contacted Gan and recorded discussions about future cash pickups. Recordings relating to three cash exchanges in May and June 2018 formed the basis for the money laundering charges at issue, though ample evidence—including the ease with which Gan facilitated these complex transactions—indicated that Gan had prior involvement.

B.  *Gan's Trial*

A federal grand jury returned a five-count indictment against Gan. Count I alleged participation in a money laundering conspiracy under 18 U.S.C. § 1956(h). Counts II through IV alleged that Gan participated in three money laundering transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (a)(1)(B)(ii). Count V charged Gan with conducting an unlicensed money transmitting business under 18 U.S.C. § 1960(a). Gan pleaded not guilty and took his case to trial.

The jury acquitted Gan on the Count I conspiracy charge. The government presented evidence to support the conspiracy charge during direct examination of a Department of Homeland Security agent who testified as an expert on money laundering organizations. The agent testified about transcripts from intercepted communications between other members of the money laundering organization. These transcripts did not contain messages sent or received directly by defendant Gan himself, but the participants in the conversations discussed Gan and his involvement.

The jury convicted Gan on Counts II through V for the three recorded money laundering transactions and conducting the associated unlicensed money transmitting business. Lim testified against Gan by describing her role as a courier in these three transactions and many prior, uncharged transactions. Lim's testimony detailed the complex procedures used in the money hand-offs and demonstrated that Gan arranged for the drug organization clients to meet with her to drop off the money. Lim also described other conversations with Gan about the money laundering. These conversations made clear that Gan was intentionally engaging in money laundering for drug trafficking organizations and even seeking out opportunities to expand the operation.

As just one example, Lim walked the jury through a transcript of a conversation in which Gan used racist language to describe the demographics of Detroit, concluding that "there will be products" there because "Law and order are not good." Lim testified that she understood "products" to mean "drug money." Gan's role in money laundering was clear from Lim's testimony, itself corroborated by intercepted

communications and recordings of the three transactions in which Lim participated undercover.

II.  *Law Enforcement Expert Testimony*

Gan challenges some expert testimony provided by the Department of Homeland Security agent. Gan does not challenge the agent's qualification as an expert, her general testimony explaining money laundering operations, or her interpretation of coded language in intercepted communications. He instead contends that the agent improperly went beyond translating code words and phrases and provided wholesale interpretations of uncoded communications that the jury should have been left to interpret on its own.

A.  *Background*

It is well established that, with a sufficient foundation, a law enforcement expert may explain the methods and the jargon and code words used in complex or unfamiliar criminal enterprises. E.g., *United States v. York*, 572 F.3d 415, 421–23 (7th Cir. 2009) (explaining that law enforcement experts may testify to "the meaning of drug code words"); *United States v. Winbush*, 580 F.3d 503, 510–11 (7th Cir. 2009) ("Our court has long recognized that testimony regarding the methods used by drug dealers is helpful to the jury and therefore a proper subject of expert testimony."); *United States v. Romero*, 189 F.3d 576, 584–85 (7th Cir. 1999) (recognizing "the value of expert testimony in explaining a complicated criminal methodology"). Such testimony is proper under Federal Rule of Evidence 702 when it helps the jury "to understand the evidence."

Expert testimony ordinarily is not needed, though, to provide an "interpretation" of an unambiguous term or phrase

that jurors can understand without expert help. See, e.g., *York*, 572 F.3d at 423, citing *United States v. Rollins*, 862 F.2d 1282, 1292 (7th Cir. 1988). Such testimony is not, in terms of Rule 702, helpful to a jury. Similarly, an expert witness may not provide an interpretation of an ambiguous or obscure word or phrase that is not based upon the witness's expertise. Such interpretations "would merely put an expert gloss on a conclusion the jury should draw." *Id.*

Whether an expert's testimony is permissible under Rule 702 depends upon whether it would be helpful to the jurors who lack the expert's knowledge of and experience with the relevant criminal enterprise. At the same time, in the flow of a trial, the boundaries between proper and improper opinion testimony are not always sharp. Counsel and the trial judge often may not care too much about exactly how the expert's testimony is structured or limited. We therefore review only for an abuse of discretion a district judge's decisions policing that boundary. *York*, 572 F.3d at 429; *Rollins*, 862 F.2d at 1292. Even if the fuzzy boundary was crossed, we will not reverse if the error was harmless. *York*, 572 F.3d at 429–30.

The government argues that Gan waived his challenge to the expert testimony, but we do not agree. Although Gan did not deliberately waive this issue, counsel did not object to the vast majority of the testimony challenged on appeal. There was one objection raised at a sidebar by Gan's counsel to the agent characterizing certain messages as "important." The judge properly overruled this objection, stating that as "an expert offering an opinion, she can differentiate unimportant and important parts of a conversation." This objection did not preserve for appellate review the broader objections Gan argues on appeal. As a result, we review the district court's

admission of the expert testimony under the plain-error standard. See, e.g., *United States v. Garcia-Avila*, 737 F.3d 484, 488 (7th Cir. 2013). "On plain-error review, we may reverse if: (1) an error occurred, (2) the error was plain, (3) it affected the defendant's substantial rights, and (4) it seriously affected the fairness, integrity, or public reputation of the proceedings." *United States v. Thomas*, 933 F.3d 685, 690 (7th Cir. 2019), citing *United States v. Olano*, 507 U.S. 725, 732–38 (1993).

If Gan had raised at trial the objections he raises on appeal, and if they had had merit, it would have been easy for the court and prosecution to make adjustments. It rarely makes sense for an appellate court to find plain error and order a new trial based on a failure to raise such easily corrected objections. In terms of plain-error review, we are not saying there were errors, let alone plain ones, at steps one and two. We decide the issue on the ground that we find at step three no effect on Gan's substantial rights, and we find at step four that the district court's handling of this witness did not seriously impugn the fairness, integrity, or public reputation of judicial proceedings. See generally *Olano*, 507 U.S. at 736. Under either an abuse-of-discretion or plain-error standard of review, a harmless error does not merit reversal. *United States v. Causey*, 748 F.3d 310, 319–20, 322 (7th Cir. 2014) (affirming conviction where handling of government witness's dual-role testimony was harmless error). An error is harmless if an average juror would not have found the prosecution's case "significantly less persuasive" without the improper testimony. *Id.* at 319, quoting *York*, 572 F.3d at 429.

During the agent's testimony, the government introduced transcripts of intercepted communications that were not sent or received by Gan but that discussed his participation in the

money laundering. The prosecutor followed a pattern of reading a few messages aloud and then asking the agent whether she had an opinion as to what was discussed. She would reply "yes," and the prosecutor would then ask what that opinion was. The agent would rephrase and summarize the messages, and the prosecutor would follow up, asking how she reached her conclusions. If the messages contained coded language, she would explain the code. These exchanges contained a combination of helpful decoding of jargon alongside rephrasing of the messages' clear, noncoded contents.

As one example of how the messages were introduced during the agent's direct examination, the prosecutor read an exchange where a participant said: "I have another transaction. Can it be done? It's in the windy. For 300." The other participant confirmed that yes, the transaction was possible, and the first participant said: "The meeting on Tuesday in Chicago is confirmed." The prosecutor asked the agent for her "opinions" of what was "going on" in that conversation. The agent summarized: "This is a conversation … discussing a money pickup in Chicago for $300,000." When asked how she reached that conclusion, the agent explained that "windy" is "coded language for Windy City, Chicago" and that "'300' is going to be $300,000. It's very common for money launderers to drop zeros. I've seen this a lot of times."

B. *Analysis*

By reading blocks of messages aloud and then asking the agent to summarize their contents, the prosecutor invited interpretations of all language, coded or not. The procedure offered advantages in terms of faster, more concise presentation of evidence, but it also made at least some interpretation of unambiguous, noncoded language inevitable.

If Gan's counsel had objected at trial, the fix would not have been difficult. Questions could have been narrowed so that the agent would have been asked to interpret only coded phrases and jargon rather than entire unambiguous, non-coded conversations. The examination of the agent would have taken longer, but the same substance would have been presented to the jury.

Without pertinent objections at trial, Gan could prevail on appeal only if he could show that the now-challenged testimony affected his substantial rights, meaning that it prejudiced him. Because Gan cannot show prejudicial effect, we need not apply the first and second steps of plain-error review to decide whether there were any clear or plain errors. We find no prejudice for three principal reasons.

First, the testimony challenged on appeal was most relevant to the conspiracy charge on which Gan was acquitted. The counts of conviction were supported by Lim's testimony and transcripts of communications involving Gan directly that Lim, not the agent, testified about. Gan argues that the agent's testimony affected his convictions by suggesting he was predisposed to commit money laundering and undermining his defense of entrapment. But Gan challenges only specific parts of the agent's testimony. He has not explained why these portions rather than her other permissible testimony suggested Gan was predisposed to commit money laundering based on his prior involvement in the operation.

The agent's uncontested general testimony—including about how money launderers use serial numbers on dollar bills as identification and other methods of concealing their identities while assuring the security of the money—matched the methods that Gan used with Lim while she carried out

money hand-offs undercover. Gan's familiarity with those procedures tended to prove that he had prior experience in money laundering, undermining the entrapment defense. Additionally, Lim's testimony confirmed that before she became a cooperating witness, Gan had directed multiple money hand-offs for which she served as the courier. Gan's experience with and predisposition for illegal money laundering were brought out in many ways during the trial, independent of the challenged testimony from the agent.

Second, the agent did not work on investigating Gan's case, so she did not testify in a dual role as both a lay and expert witness, where the risk of unfair prejudice can be "more troublesome." *Garcia-Avila*, 737 F.3d at 489. Gan's challenge to the agent's testimony relies heavily on our precedents concerning dual-role testimony in which an agent testifies to her lay opinions based on observations during the relevant investigation *and* to her expert opinions based on career experience. In those cases, we have recognized a risk that if it is not clear to jurors whether the witness is testifying in an expert or lay capacity in answering a question, the jurors could be confused about the basis of the testimony. E.g., *York*, 572 F.3d at 425 (noting how the "witness's dual role might confuse the jury").

For example, if the witness translates code words from messages sent by the defendant, the jury might assume that the witness is relying on facts outside the trial evidence (such as perhaps interrogations of the defendant or others) rather than on prior experience with similar cases. The jury might give special weight to this witness's testimony, assuming that she based her opinions on information not presented at trial. More generally, the jury could be "smitten by an expert's

'aura of special reliability.'" *York*, 572 F.3d at 425, quoting *United States v. Brown*, 7 F.3d 648, 655 (7th Cir. 1993). The jurors could then have difficulty in examining the evidence independently and critically. See *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (noting that the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact"). Those potential concerns call for care in managing dual-role testimony from law enforcement, though they should not be difficult to manage in response to timely objections. See generally *United States v. Jett*, 908 F.3d 252, 268–70 (7th Cir. 2018) (suggesting procedures and jury instructions to help manage risks of dual-role testimony).

In this case, however, the agent testified only as an expert, not as a fact witness. Her role as an expert who did not participate in the case investigation was made crystal clear several times during her testimony. The judge also drove the point home, telling the jury that her testimony was "general testimony, not relating to this—the alleged scheme in this case or this defendant … And this defendant can only be convicted on evidence directly relating to his participation in [ ] a conspiracy." The clarity of the agent's lack of participation in the investigation removes concerns that the jury might have assumed she had knowledge of facts outside of evidence affecting her interpretations of messages.

The related third reason that the handling of the agent's opinions did not prejudice Gan is that we assume juries follow the instructions they are given, absent evidence to the contrary. E.g., *United States v. Ajayi*, 808 F.3d 1113, 1123 (7th Cir. 2015). The district judge instructed this jury to

analyze the agent's testimony "the same way you judge the testimony of any other witness." The instructions also told jurors to consider her "qualifications, how she reached her opinions and conclusions," and her believability. The jurors were free to interpret the messages differently than the agent did and to discount her testimony, especially if they felt that her expertise did not give her an advantage in interpreting communications without code words or jargon.

Given the strong evidence against Gan presented outside of the challenged testimony, the fact that the testimony addressed a count on which Gan was acquitted, the lack of more concerning dual-role testimony, and the jury instructions guarding against accepting the agent's testimony without critical analysis, we find no reversible error in admitting her testimony.

III. *Mens Rea in the Aiding and Abetting Instruction*

Next, Gan argues that his convictions should be reversed because a jury instruction erred in describing the mental state required to convict him on a theory that he aided and abetted the money laundering. Gan's counsel never objected to the instruction and in fact approved it before it was given.

Federal Rule of Criminal Procedure 30 governs the determination of jury instructions in criminal trials and sets forth how to preserve for appeal objections to the final instructions. Objection requires a party to state a "specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). "Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)," *id*., which allows review for a "plain error that affects substantial rights," Fed. R. Crim. P. 52(b).

The parties and district court went through several rounds of proposed jury instructions. The government's first proposal included a version of Seventh Circuit Pattern Jury Instruction 5.06 on aiding and abetting liability: "If a defendant knowingly causes the acts of another, then that defendant is responsible for those acts as though he personally committed them." While counsel debated other instructions, Gan never made an issue of this one. At various times, his counsel and the court labeled it "agreed," "unopposed," and "given without objection." Gan's express approval of the aiding and abetting instruction shows a failure to object under Rule 30(d), so our review is limited to plain-error review under Rule 52(b).[1]

---

[1] Some of our cases have tried to distinguish between waiver and forfeiture of jury instruction errors, asking for instance whether an attorney stating that she has "no objection" to any instructions should constitute waiver or still allow for plain-error review. E.g., *United States v. Freed*, 921 F.3d 716, 720 (7th Cir. 2019) (acknowledging "harshness" of finding waiver from stating "no objection" and suggesting there are exceptions to the waiver rule); *United States v. Groce*, 891 F.3d 260, 269 (7th Cir. 2018) (noting difficulty of distinguishing between forfeiture and waiver in this context); *United States v. Natale*, 719 F.3d 719, 729–31 (7th Cir. 2013) (stating that affirmative approval of jury instruction can waive later challenge, but noting that a court may still consider waived issue when interests of justice so require). *Freed*, *Groce*, and *Natale* did not turn on the difference, since all ultimately found that the challenges failed even under plain-error analysis. *Freed*, 921 F.3d at 720; *Groce*, 891 F.3d at 269; *Natale*, 719 F.3d at 731.

Rule 30(d) gives clear instructions for appellate challenges to jury instructions. The rule does not distinguish between waiver and forfeiture. Whether an attorney explicitly approves a particular instruction or notes that she has "no objection" to any instructions, the attorney has failed to present a specific objection as required under Rule 30(d). Under the rule's text, only plain-error review is allowed, but it *is* nevertheless allowed, not prohibited on a waiver theory. Given the lack of distinction between

It is plain error to give a jury instruction that misstates the mens rea requirement for a crime that is dictated by statute. We have already said that the mens rea language challenged by Gan in this pattern instruction "is obviously problematic." *Freed*, 921 F.3d at 721. As in *Freed*, however, we are not convinced that the language affected the defendant's substantial rights, which "usually means that the error 'must have affected the outcome'" of proceedings. *United States v. Cotton*, 535 U.S. 625, 632 (2002), quoting *Olano*, 507 U.S. at 734. We find no reversible error in the instruction.

First, ample evidence supported Gan's conviction under alternate theories relying on unchallenged instructions and even under a corrected version of the challenged instruction itself. The jurors would have relied on the challenged instruction only if they thought both that Gan acted not as a principal but as an aider and abettor, *and* that the couriers he directed were unaware that they were participating in criminal activity. As Judge Durkin correctly noted in rejecting Gan's post-trial challenge to the instruction, there was ample evidence to convict Gan for acting as a principal, in which case the jury would have relied on an unchallenged instruction.

---

waiver and forfeiture in Rule 30(d), it is not clear that the distinction should affect our level of review of jury instructions. In virtually every trial, all attorneys will be required to state on the record whether they approve or object to jury instructions before they are given, making forfeiture through silence impossible. See Fed. R. Crim. P. 30. At least in the absence of invited error, appellate counsel and we might do better to focus on Rules 30(d) and 52(b) rather than wading into whether waiver is shown. Cf. *United States v. Muskovsky*, 863 F.2d 1319, 1329 (7th Cir. 1988) (even plain-error review not available for invited errors in jury instructions).

Further, there was sufficient evidence to convict Gan as an aider and abettor directing couriers who were aware of the illegality, in which case the jury would have relied on yet another unchallenged instruction. Finally, even if the jury had relied on the instruction at issue, the district court noted that framing the question in terms of "willful" rather than "knowing" would not have made a difference. The difference can be subtle to the point of being invisible. In any event, the evidence lent strong support for finding that Gan acted willfully in the sense that he knew what he was doing was illegal. Gan has not offered a persuasive explanation under which the jury might have believed that he acted knowingly yet not willfully in facilitating the money laundering through the complex procedures he directed. The use of the jury instruction that Gan approved did not result in a denial of substantial rights, nor did it undermine the integrity or reputation of the proceedings. We will not reverse on plain-error review.

## IV. *Prosecutorial Misconduct*

Gan argues next that his Fifth Amendment right to a fair trial was violated by prosecutorial misconduct in closing argument. He contends the government made improper remarks targeting the defense attorney and vouching for a witness. No objections were raised at trial. We find no error, let alone any plain error, in the challenged remarks.

### A. *Background*

To determine whether alleged prosecutorial misconduct occurred and calls for reversal, we first read the challenged remarks in isolation and decide whether they were improper. *United States v. Carswell*, 996 F.3d 785, 796 (7th Cir. 2021). If not, the challenge fails. If we do find a remark improper, we

then consider it in the context of the entire trial record to evaluate whether the remark deprived a defendant of the right to a fair trial. We take into account: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000); see also *Darden v. Wainwright*, 477 U.S. 168, 181–82 (1986) (establishing factors). The weight of the evidence is the most important factor. *Carswell*, 996 F.3d at 796.

Defense counsel did not object to any of the challenged statements during trial, so we review them only for plain error. No plain error occurred unless Gan "probably would have been acquitted" if the prosecutor had not made the challenged remarks. *United States v. Norwood*, 982 F.3d 1032, 1053 (7th Cir. 2020) (citation omitted); see also *United States v. Kelerchian*, 937 F.3d 895, 917 (7th Cir. 2019) (plain error requires defendant to show remarks were obviously improper and "that the outcome of the trial probably would have been different absent the prosecution's remarks"), quoting *United States v. Hills*, 618 F.3d 619, 640 (7th Cir. 2010). Reversals are exceedingly rare for closing arguments that did not draw even an objection at trial: "In essence, the question is whether the argument was so egregious that the trial judge was required to intervene without a defense objection." *Kelerchian*, 937 F.3d at 917.

B.  *Analysis of Challenged Statements*

   1.  *Targeting Defense Attorney Personally*

We begin with the statements allegedly targeting the defense attorney personally. Attorneys should not attack opposing counsel personally, but they may criticize opposing counsel's tactics and the strength of the evidence. See *United States v. Bloom*, 846 F.3d 243, 254 (7th Cir. 2017) (the government may point to the lameness of the defense and may "criticize[ ] defense counsel's tactics, [but] not defense counsel personally").

Our cases illustrate this line between criticism of tactics and personal attacks. We found no reversible error where a prosecutor called defense counsel's arguments "'made up,' 'absolutely false,' 'ridiculous,' or 'ludicrous.'" We said these comments "were largely focused on the lameness of the defense rather than defense counsel personally." *United States v. Washington*, 417 F.3d 780, 786–87 (7th Cir. 2005). We also found no error where a prosecutor said that defense counsel was "putting up a 'smoke screen'" and that cross-examination was so repetitive as to "border[ ] on a waste of the jury's time." *Bloom*, 846 F.3d at 254.

An impermissible personal attack did occur when a prosecutor suggested even jokingly that defense counsel had committed a crime, saying that "defense counsel had apparently broken the antenna off of someone's car" and used it as a pointing device during argument. *United States v. Mealy*, 851 F.2d 890, 903 (7th Cir. 1988). In a civil case we found that comments were personal attacks where defense counsel referred "to plaintiffs' lawyer disparagingly as 'an amateur' on numerous occasions … [and] interfered with [her] legitimate

attempts to raise objections, barking at her to 'sit down' and 'stop interfering,' and claiming in the presence of the jury that she 'didn't know the rules.' He literally grabbed papers out of her hands…." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 261 (7th Cir. 1996) (ordering new trial on multiple grounds).

Here, Gan challenges several of the prosecutor's statements during closing remarks, including that the defense theory was "ridiculous," a "trip to fantasy land," and "garbage." Many of these challenged statements appear in the first moments of the argument:

> Well, I hope you enjoyed your trip to fantasyland where the defendant is a poor, misunderstood fish salesman who accidentally laundered tens of millions of dollars for Mexican drug cartels. That is absolutely ridiculous. It is contrary to all of the evidence in this case, and it is designed to distract you. It is garbage. You should treat it like garbage, and you should throw it out. Let's get back to reality. Three things that matter back here in the real world: evidence, law, and your common sense.

This language closely mirrors that challenged unsuccessfully in *Washington*. 417 F.3d at 786–87 (rejecting challenge to calling opposing counsel's arguments "ridiculous" and "made up"). The comments here all urged the jurors to focus on the evidence. The prosecutor properly centered his rhetoric on the weakness of the defense theory in the face of specific evidence.

Next, Gan challenges as a personal attack the prosecutor's statement that "try as they might to embarrass [Lim] about

her personal life and the illnesses within her family, she stood firm and she told you the truth … Defense counsel likes to talk about illusions and magic, but none of that was involved." Defense counsel used the term "illusion" eight times in opening remarks, saying, for example, that an "illusion of events is being utilized by the government…." The prosecutor criticized here a specific phrasing of the defense's theory. It was not a personal attack on the defense attorney. There was no misconduct.

Last, Gan complains that the prosecutor twice said during closing that "lawyers mumble; evidence speaks." In isolation, perhaps this odd phrase could be interpreted as improperly attacking an attorney's manner, stature, or even speech impediment. In context here, however, the prosecutor tied the phrase to specific facts to demonstrate why the jurors should disregard certain arguments from defense counsel in light of evidence.

The prosecutor first used this phrase to counter what "[d]efense counsel just got up here and told you, 'My client doesn't do transactions in the United States.'" The prosecutor asked the jury to compare this argument to specific messages showing that Gan participated in transactions in Chicago.

The second use came while discussing the defense's theory of entrapment. The prosecutor asked the jury to "[e]xamine the power dynamic. Who's calling the shots? … Lawyers mumble; evidence speaks. Read the evidence." The attorney then read the portion of a transcript with Gan telling Lim that there would be "product" in Detroit. In interpreting the transcript, the prosecutor asked the jury to use "common sense. He's not talking about fish flopping around on the streets of Detroit. He's talking about drug money, and he

wants to expand there, because he wasn't coerced; he wasn't tricked. He wanted to do it. He is expanding into Detroit because he's predisposed to commit these crimes." We find no misconduct in the use of the odd phrase to focus the jury on specific pieces of evidence that conflicted with the defense theory.

2. *Vouching*

Moving to the second category of challenged statements, Gan argues that the prosecution improperly vouched for Lim's credibility. Vouching occurs when an attorney expresses her personal belief in the truthfulness of a witness or implies that facts not in evidence support a witness's credibility. See, e.g., *United States v. Brasher*, 962 F.3d 254, 269 (7th Cir. 2020). Comments about a witness's credibility are proper, however, when they "'reflect[] reasonable inferences from the evidence' rather than a personal opinion of the prosecutor." *United States v. Chavez*, 12 F.4th 716, 728 (7th Cir. 2021), quoting *United States v. Wolfe*, 701 F.3d 1206, 1212 (7th Cir. 2012). When a prosecutor comments on a government witness, it is "well established that the government can point out that its witnesses, under their plea agreements, are required to testify truthfully." *United States v. Briseno*, 843 F.3d 264, 272 (7th Cir. 2016) (internal quotation omitted).

The challenged statements about Lim include that her testimony "was authentic because she has no motivation to lie to you," and that she was "here to tell the truth, keep the deal, and get off. She's self-interested. Why would she risk losing that 50 percent recommendation to spend up to 20 years in prison just to frame up an innocent man?" These comments properly explained facts in evidence about Lim's cooperation deal. The prosecutor specifically noted that "you heard her

benefit gets no better if [Gan is] convicted and no worse if he's acquitted. So why in the world would she risk getting up there and telling you a fake story?" Gan also challenges the following question posed by the prosecutor to the jury: "If she was going to lie for the government, wouldn't she have tossed in some extra details to help us out?" In the same breath, the prosecutor noted that Lim never claimed Gan directly explained to her that the money involved was drug proceeds, a fact that would have helped the government. Finally, Gan challenges the prosecutor's statement that Lim said Gan "was her friend. And you can see she was uncomfortable up there because she felt bad and guilty about having to come out about the truth of what they did."

These challenged comments about Lim's credibility were explicitly tied to the facts in evidence about her testimony, her own deal, and inferences about her motives to be truthful. None of the prosecutor's statements about Lim implied that he knew facts outside of the evidence affecting her credibility or expressed a bare assertion that he believed Lim was telling the truth. We find no misconduct.[2]

V. *Reliance on Acquitted Conduct at Sentencing*

Last, Gan challenges the district court's consideration of his acquitted conspiracy charge at sentencing. The district judge found that the government proved the conspiracy-related conduct by at least a preponderance of the evidence. The judge calculated Gan's guideline range as 324 to 405 months based on both the convicted and acquitted counts. Gan's guideline range based solely on the offenses of conviction

---

[2] Gan also argues that the cumulative effect of errors requires a new trial. Because we find no errors, this argument fails.

would have been 135 to 168 months. The district court imposed a final sentence of 168 months.

Gan does not challenge the district judge's finding that the prosecution proved the conduct underlying the acquitted charge "not just by a preponderance of the evidence but beyond a reasonable doubt." Gan challenges more generally the practice of considering acquitted conduct at sentencing. The Supreme Court has held squarely that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997); see also *United States v. Booker*, 543 U.S. 220, 232–33 (2005) (mandatory nature of Sentencing Guidelines made consideration of acquitted conduct at sentencing inconsistent with Sixth Amendment, but problem was remedied by rendering Guidelines advisory). Nonetheless, Gan has preserved the issue for further review by objecting to the practice at the sentencing hearing and in briefing before this court.

The judgment of the district court is AFFIRMED.