In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-1691

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARCOS BAHENA,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19-cr-00744-2 — **Gary Feinerman**, *Judge.*

———————————

ARGUED APRIL 6, 2023 — DECIDED JUNE 22, 2023

———————————

Before FLAUM, ST. EVE, and PRYOR, *Circuit Judges.*

FLAUM, *Circuit Judge.* Marcos Bahena appeals from a jury
conviction for conspiring to possess cocaine with intent to dis-
tribute. He argues that multiple errors occurred during the
trial—most notably, that the government's expert witness tes-
tified beyond the scope of his expertise. He also contends that
the government did not present enough evidence to support
the conviction. For the reasons discussed below, we affirm.

## I. Background

In March 2019, agents intercepted calls via a wiretap on Jose Bahena's phone. Despite Jose's attempts to obscure his plan by using coded language, the wiretap revealed that he was arranging an illicit transaction. He spoke with a supplier who would be bringing new product into town on a semitruck, as well as with a distributor who would help sell the product upon its arrival. In addition, Jose had frequent calls with his brother, Marcos, the defendant in this case. Marcos's main role was to arrange a clandestine meeting spot where they could pick up the product from the supplier's courier. To that end, Marcos contacted "Juanito," who had access to a private parking space big enough for a semitruck. Juanito agreed to let them use the space if they paid him; the brothers decided to offer him $500. Marcos also informed Juanito of the meeting's purpose so that he would not be surprised and would let them use the spot for future drop-offs.

On the day of the deal, Jose and Marcos exchanged multiple calls settling final logistics. That night, authorities watched Marcos leave his home and head to the parking space. Jose and Juanito joined him. A semitruck then drove up to the parking lot and, after someone opened the gate to the lot, backed in. Before long, the group disbanded. When Marcos called Jose later that night, he relayed that Juanito had been "getting kind of scared" due to the risk he was taking.

The next day, authorities observed Jose meet with the distributor's courier under a bridge. Jose got into the courier's car carrying a plastic bag. Within a couple minutes, he exited the car empty-handed and drove off. The courier left too, but

officers promptly pulled him over and found the plastic bag. It contained a powdery substance later identified as cocaine.

Marcos was arrested and charged with possessing cocaine with intent to distribute as well as with conspiring to do so. He went to trial, where the government called numerous agents and officers to testify. Relevant for our purposes, an expert in drug-dealing practices and terminology interpreted some of the wiretap transcripts. Marcos called no witnesses; his main strategy was to cast himself as a pawn in Jose's scheme. The jury found Marcos guilty of the conspiracy but not of the substantive possession offense. Marcos appeals.

## II. Discussion

On appeal, Bahena mounts a series of attacks on his conviction.[1] Primarily, he challenges the scope of the expert witness's testimony. He also requests a mistrial based on two jurors' receipt of unadmitted exhibits and two witnesses' references to his incarceration. These three issues, Bahena contends, cumulatively deprived him of a fair trial. Finally, Bahena argues that the evidence does not support the jury's verdict. We address each subject in turn.

### A. Scope of Expert Testimony

Bahena's first argument concerns the scope of Special Agent German Samaniego's expert testimony. The government called Samaniego to testify about drug-trafficking practices in general and to interpret portions of the wiretap call transcripts. As to the latter, the government asked Samaniego

---

[1] For the rest of this opinion, we refer to Marcos as "Bahena."

to read aloud entire conversations from the transcripts. Sama-niego would then opine as to what the callers discussed over the course of the exchange.

We have often recognized the admissibility of expert testimony to "explain the methods and the jargon and code words used in complex or unfamiliar criminal enterprises." *United States v. Gan*, 54 F.4th 467, 474 (7th Cir. 2022); *see also United States v. York*, 572 F.3d 415, 423 (7th Cir. 2009) ("[T]he Rules of Evidence allow expert law enforcement witnesses to translate drug jargon and code words that might seem entirely innocuous to an untrained jury."). Bahena does not challenge Samaniego's testimony about drug-dealing practices and drug-specific parlance.

Instead, Bahena objects that the government's technique of eliciting testimony about the wiretap transcripts resulted in "wholesale interpretations of uncoded communications that the jury should have been left to interpret on its own." *See Gan*, 54 F.4th at 474. Bahena did not raise this objection below, so we review for plain error. *Id.* at 475. That means Bahena must show "(1) an error occurred, (2) the error was plain, (3) it affected [his] substantial rights, and (4) it seriously affected the fairness, integrity, or public reputation of the proceedings." *United States v. Thomas*, 933 F.3d 685, 690 (7th Cir. 2019).

To Bahena's point, the government's questioning was not precise. For example, at the government's request, Samaniego read aloud the following exchange:

> Jose: Where are you?
>
> Bahena: Here at the house. Um, I
> just got here.

> Jose: Hey, call up Juanito and ask
> him where – some of the big ones
> so they can deliver to me tomor-
> row or the day after tomorrow.
>
> Bahena: I'll ask him right now and
> see what he tells me.[2]

Afterwards, the government directed Samaniego to "walk the jury through [his] interpretation of what that meant." He began, "They're discussing where they are. He's at the house. He just got there." Samaniego then said that Jose told Bahena to ask "somebody named Juan where they can put one of the big ones, referring to a tractor-trailer or semi, so that they can deliver tomorrow, meaning that there's going to be a meeting between the courier and either Jose or Marcos who's going to pick up the drugs there." Samaniego's testimony contains many more exchanges of this variety.

Our recent *Gan* decision reviewed for plain error similar (albeit, arguably less open-ended) expert testimony interpreting intercepted communications. *See Gan*, 54 F.4th at 474–75. We held that the defendant did not satisfy plain error's third prong, which asks whether the claimed error affected the defendant's "substantial rights." *Id.* at 475.[3] In other words, the expert testimony did not "affect[] the outcome of the district court proceedings." *See United States v. Cotton*, 535 U.S. 625,

---

[2] The calls were in Spanish but had been translated to English.

[3] We noted in *Gan* that we were "not saying there were errors, let alone plain ones, at steps one and two," but we added that the defendant did not satisfy plain error's fourth prong (regarding "the fairness, integrity, or public reputation of judicial proceedings"). *Id.* In this case, we confine our holding to just the substantial-rights prong.

632 (2002) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). The same is true here.

In *Gan*, several pieces of evidence "independent" from the challenged testimony went to showing the defendant's guilt for the at-issue charge. *Gan*, 54 F.4th at 476–77. Here, the government notes that it too introduced evidence besides Samaniego's testimony. Bahena responds that, whereas the expert testimony in *Gan* mostly concerned a charge on which the defendant had been acquitted, *id.* at 476, Samaniego's testimony was obviously relevant to the conspiracy conviction. He thus suggests that no amount of "independent" evidence could make up for the prejudice Samaniego's testimony caused.

Accepting that this case is closer than *Gan*, Bahena overstates the importance of Samaniego's testimony. The government called eleven witnesses other than Samaniego—including numerous agents and officers who investigated the case and provided their eyewitness accounts of the transactions. In all, Samaniego's testimony about the wiretap transcripts takes up approximately twenty-five pages of over 250 total pages of witness testimony. *Cf. United States v. Hawkins*, 934 F.3d 1251, 1267 (11th Cir. 2019) (holding that similar testimony affected the defendant's substantial rights because the expert "was the principal prosecution witness," taking up "over two hundred pages of trial transcript" compared to the "fewer than one hundred transcript pages" for "the other eight trial witnesses combined"). Samaniego was hardly the centerpiece of the government's case.

Even more, and despite Bahena's insistence to the contrary, Samaniego's testimony was not the only source for inferring that Bahena acted with ill intent. The jury had access

to the actual wiretap transcripts during deliberations, including ones Samaniego had not interpreted. On these facts, the transcripts, along with the attendant circumstances other witnesses described, allowed the jurors to assess Bahena's motives for themselves. *Cf. United States v. Arrellano*, 757 F.3d 623, 632–33 (7th Cir. 2014) (explaining that the context surrounding a conversation using coded language to refer to drugs "would allow a reasonable jury to" understand the meaning without expert testimony).

In short, Samaniego's challenged testimony was not as critical to the conviction as Bahena submits. Like in *Gan*, other, "independent" pieces of evidence supported the jury's decision. *See Gan*, 54 F.4th at 476–77.

Further, the district court addressed the risk of prejudice through an instruction to the jury. In *Gan*, we partially relied on the court's instruction that the jurors "were free to interpret the messages differently than the [expert] did and to discount her testimony." *Id.* at 477–78. The court's instructions here likewise emphasized that the jurors did "not have to accept [Samaniego's] opinions and testimony" and should evaluate his reliability as they would for "any other witness."

We assume the jury follows the district court's instructions. *Gan*, 54 F.4th at 477. Of course, an instruction will not always "fully or even partially cure a trial error." *United States v. Barnhart*, 599 F.3d 737, 746 n.8 (7th Cir. 2010). Here, however, we are satisfied that the instruction enabled the jury to consider the evidence free from Samaniego's "expert gloss." *See York*, 572 F.3d at 423; *see also United States v. Christian*, 673 F.3d 702, 712 (7th Cir. 2012) ("[T]he jury was free to disregard [the expert's] characterization of the [evidence] and evaluate for itself the significance of [the defendant's] conduct.").

One final note on this issue: The government urges us to discount the potential prejudice of Samaniego's testimony because he testified in a purely expert capacity. It is true that that dual-role testimony—when a witness testifies in both an expert and a lay capacity—can present an increased risk of prejudice. *E.g.*, *Christian*, 673 F.3d at 712–13. Such a witness could potentially confuse jurors; her dual role could also lead them to believe her expert opinion draws from information "not presented at trial" or to overly rely on her factual testimony due to "an expert's 'aura of special reliability.'" *York*, 572 F.3d at 425 (citations omitted). We therefore held in *Gan* that the expert's non-dual role gave another reason to doubt her testimony's prejudicial effect. *Gan*, 54 F.4th at 477.

It should be recognized, however, that non-dual testimony like Samaniego's presents its own risks. If an expert witness did not participate in the investigation, jurors may assume that he is less invested in obtaining a conviction. In turn, they might ascribe more weight to his testimony. Simply put, the appearance of objectivity could actually *enhance* the prejudice resulting from problematic expert testimony.

So, although concerns over dual-role testimony are legitimate and warrant precautions during trial, *see United States v. Jett*, 908 F.3d 252, 268–70 (7th Cir. 2018), there are countervailing considerations too. As the Pattern Instructions recognize, expert testimony always carries the risk of prejudice—dual-role or not. *See* Pattern Criminal Jury Instructions of the Seventh Circuit (2022) at 54. The government and district courts should remain vigilant when expert witnesses provide inappropriate testimony even in a non-dual capacity.

As it stands, however, Bahena has not convinced us that Samaniego's testimony violated his substantial rights.[4] His challenge fails under our plain-error review.

### B. Jurors' Receipt of Unadmitted Evidence

Bahena's next contention concerns evidence sent back to the jury. During deliberations, it came to light that two jurors received four exhibits that had not been admitted into evidence. The exhibits were transcripts of calls Bahena participated in before the relevant period for the charged offenses. For example, in one of the calls, Bahena and his brother discussed "doing a line" of cocaine.

Clearly, "materials not admitted into evidence simply should not be sent to the jury for use in its deliberations." *Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 705 (7th Cir. 2013). But Bahena made the calculated decision to abandon this objection below; after orally bringing a motion for a mistrial, he withdrew it, citing concerns over how a new trial might play out. This amounts to a waiver, so we do not review the issue on appeal. *See United States v. Flores*, 929 F.3d 443, 447 (7th Cir. 2019) ("Waiver occurs when a party intentionally relinquishes a known right and forfeiture arises when a party inadvertently fails to raise an argument in the district court.").

---

[4] Bahena also argues that we should account for the contentiousness of the jury's deliberations. Essentially, he takes the heated debate to mean that the jury would not have convicted him absent the extra push Samaniego's testimony provided. Without more, this is too speculative to evince prejudice for plain-error purposes. *Cf. Brown v. Eplett*, 48 F.4th 543, 560 (7th Cir. 2022) (discussing the ambiguity behind a split verdict).

**C. References to Bahena's Incarceration**

Bahena also claims that certain witnesses' references to his pretrial incarceration deprived him of a fair trial. The first witness the government called, a Metropolitan Correctional Center employee, intended to introduce a "jail call" as an exemplar of Bahena's voice. Before the witness could get to that point, however, Bahena objected on the grounds that her testimony would inform the jury he was incarcerated. The parties agreed to skirt the issue by stipulating that Bahena's voice was on the recorded call. Later that day, an investigating agent testified that she compared the "jail call" (using those words) to the wiretap recordings to identify Bahena's voice. Bahena objected. The court then instructed the jury to disregard the witness's "characterization" of the call.

Although Bahena objected both times the jail-call testimony arose, he did not further challenge the resolutions of the objections or move for a mistrial. Our review of whether the district court should have *sua sponte* declared a mistrial is thus for plain error only. *See United States v. Adkins*, 743 F.3d 176, 186 (7th Cir. 2014).

"[A] mistrial is appropriate when an event during trial has a real likelihood of preventing a jury from evaluating the evidence fairly and accurately, so that the defendant has been deprived of a fair trial." *United States v. Hilliard*, 851 F.3d 768, 778 (7th Cir. 2017) (alteration in original) (quoting *United States v. Collins*, 604 F.3d 481, 489 (7th Cir. 2010)). Though not wholly without prejudice, infrequent references to a defendant's jail calls typically do not warrant such drastic relief. *See United States v. Roux*, 715 F.3d 1019, 1029 (7th Cir. 2013) ("[W]e have no reason to believe that the single reference to 'jail calls' deprived Roux of a fair trial."); *see also Thomas*, 933 F.3d at 692

(rejecting the argument that a "reference to the 'jail phone call' was unfairly prejudicial"); *United States v. Johnson*, 624 F.3d 815, 821–22 (7th Cir. 2010) (reasoning that jail-call evidence subjects defendants to "a much diminished form of prejudice" compared to defendants who "stand trial in prison garb").

Bahena's case aligns with this precedent. The Correctional Center employee's vague testimony and the agent's fleeting use of the term "jail call"—which the district court addressed through a limiting instruction, *see United States v. Harris*, 325 F.3d 865, 871 (7th Cir. 2003)—fall short of demanding a mistrial, especially under our plain-error review.

### D. Cumulative Error

Bahena argues that the above three errors *combined* created enough prejudice to warrant a new trial. It is indeed possible for multiple errors, harmless alone, to cumulatively "infect[] the jury's deliberation" such that the defendant does not receive "a fundamentally fair trial." *United States v. Groce*, 891 F.3d 260, 271 (7th Cir. 2018) (quoting *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001)).

Bahena waived his objection to the jurors' receipt of unadmitted evidence, so the only two issues that could theoretically come into play here are Samaniego's testimony and the allusions to Bahena's jail calls. *See Alvarez v. Boyd*, 225 F.3d 820, 825 (7th Cir. 2000). While Samaniego's testimony is somewhat problematic, the jail-call testimony hardly tips the scales in Bahena's favor. *See id.* ("[C]ourts must be careful not to magnify the significance of errors which had little importance in the trial setting."). Thus, looking through the lens of possible cumulative prejudice, Bahena is not entitled to a new trial.

**E. Sufficiency of the Evidence**

Finally, Bahena maintains there was insufficient evidence supporting the jury's verdict. As part of this argument, he focuses on the jury's decision to acquit him of possessing cocaine with intent to distribute while also convicting him of *conspiring* to do so. Bahena contends that these verdicts are inconsistent and indicate the conviction on the conspiracy charge lacked support. This is particularly so, he says, because the same evidence underlies both verdicts.

"Typically, a guilty verdict will stand (so long as the evidence is sufficient to support it) notwithstanding an inconsistent verdict on a related offense …." *United States v. Wilbourn*, 799 F.3d 900, 910–11 (7th Cir. 2015) (quoting *United States v. Moore*, 763 F.3d 900, 910 (7th Cir. 2014)). Even when "[t]he jury's decision is inscrutable," an acquittal on one count does not invalidate a guilty verdict on another. *United States v. Weller*, 40 F.4th 563, 566 (7th Cir. 2022) (affirming a verdict when the jury had acquitted the defendant of three "substantive charges" of violating securities laws while also convicting him "on a single charge of conspiracy to violate the securities laws"), *cert. denied*, 143 S. Ct. 427. So, assuming for the sake of argument that the jury's verdict is inconsistent here, we would still need to "assess the conspiracy conviction as if it had been the only charge." *Id.*

On that note, Bahena contends that the evidence does not support the conspiracy conviction in isolation. To succeed, he must show that, "viewing the evidence in the light most favorable to the government, [no] rational trier of fact … could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015). A defendant bringing this challenge faces "a nearly

insurmountable hurdle." *Id.* (quoting *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014)).

As previewed in Section II.A, the jury had a sufficient basis to find there was an agreement to distribute cocaine that Bahena "knowingly and intentionally joined." *See United States v. Fitzpatrick*, 32 F.4th 644, 649 (7th Cir. 2022) (quoting *United States v. Pulgar*, 789 F.3d 807, 813 (7th Cir. 2015)).[5] The wiretap transcripts indicate that Bahena worked closely with his brother and Juanito to arrange the meeting. Those transcripts, along with eyewitness testimony, confirm that Bahena was at the parking lot when the semitruck pulled in. Samaniego testified that drug organizations often use semitrucks to transport drugs. The next day, authorities saw Bahena's brother drop off a package with a third party under a bridge; when officers pulled the third party over, there was a package of cocaine in the car. In addition, Bahena's reference to Juanito's concern over the risk involved suggests Bahena was aware of the plan. This is enough to sustain the conviction.

### III. Conclusion

For these reasons, we AFFIRM Bahena's conviction.

---

[5] A sufficiency-of-the-evidence challenge accounts for "all of the evidence admitted by the trial court[,] … regardless of whether that evidence was admitted erroneously." *United States v. Chaparro*, 956 F.3d 462, 470 (7th Cir. 2020) (quoting *United States v. Rahman*, 805 F.3d 822, 839 (7th Cir. 2015)). As such, we could consider Samaniego's testimony interpreting the wiretap transcripts in this context even if we agreed with Bahena that its admission was in error. At any rate, the other evidence in this case sufficiently supports the jury's conviction.